THE SYNANON CHURCH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Synanon Church v. Commissioner
Docket No. 20015-84.
United States Tax Court
T.C. Memo 1989-270; 1989 Tax Ct. Memo LEXIS 270; 57 T.C.M. (CCH) 602; T.C.M. (RIA) 89270; June 7, 1989; As corrected June 7, 1989 *270 Petitioner's exemption from income taxes was revoked in May 1982 retroactively to the beginning of its fiscal year 1977. Deficiencies were determined for the fiscal years 1977 through 1983. It is Held, that petitioner is entitled to have its income from Adgap, its principal source of income, determined in the light of all the evidence, not just the Adgap ledgers; Held further,sec. 277, I.R.C. 1954, is not applicable because petitioner was not operated primarily to furnish goods and services to its members, whether all the residents of the Synanon communities or only the members of the Board of Directors were members of the corporation. Held further, cash contributions solicited and obtained by petitioner are taxable income. Held further, the value of food and clothing contributed to petitioner is taxable to it; the value of such food and clothing is determined. Held further, four activities, the Synanon Distribution Network, Lifestyler Operations, Education/School, and Corporate Investment and Realty, carried on by petitioner, were not sec. 162(a) trades or businesses; petitioner is not, therefore, entitled to deduct any expenses in excess of income from such activities except *271 the expenses of Corporate Investment and Realty in earning rental income and in operating an investment office. Held further, petitioner is entitled to deductions for amounts determined to be executive compensation, other salaries and wages for nonexecutive employees, and in-kind compensation. Held further, petitioner is entitled to deductions for amounts determined for taxes, interest, depreciation, printing, postage and office supplies, minor consumables, air fares, telephones, and professional fees. Held further, petitioner is liable for additions to tax under secs. 6651(a), 6653(a)(1) and (2), and 6655. Martin A. Schainbaum, Philip C. Bourdette, and David R. Benjamin, for the petitioner. Eugene H. Ciranni and Michael K. Williams, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies [1] *272 in petitioner's Federal income taxes for the fiscal years ending August 31, 1977 through August 31, 1983: Additions to Tax [2]
Fiscal Year
Deficiency
Section
Section
Section
Section
Ended August 31
in Tax
6651(a)(1)
6653(a)(1)
6653(a)(2)
6655
1977
$ 4,551,089
$         0
$  227,554 0
0
1978
4,795,490
0
239,775 0
0
1979
4,499,129
0
224,956 0
0
1980
3,377,634
844,408
168,882 0
190,836
1981
4,074,271
1,018,568
203,714 *
236,308
1982
4,620,431
1,155,108
231,022 *
437,426
1983
2,339,937
584,984
116,997 *
149,530
Following the resolution of a dispute over respondent's right to access to petitioner's records, respondent filed an answer reducing the deficiency and additions to tax to the following amounts: Additions to Tax
Fiscal Year
Deficiency
Section
Section
Section
Ended August 31
in Tax
6651(a)(1)
6653(a)(1)
6655
Totals
1977
$ 1,688,968
$         0
$  84,448
$       0
$  1,773,416
1978
2,324,945
0
116,247
0
2,441,192
1979
2,162,028
0
108,101
0
2,270,129
1980
1,064,163
260,040
53,208
190,836
1,568,247
1981
1,733,370
433,342
86,669
236,308
2,489,689
1982
2,599,853
649,963
129,995
437,426
3,817,237
1983
1,588,814
397,203
79,441
0
2,065,458
Totals
$ 13,162,141
$ 1,740,548
$ 658,109
$ 864,570
$ 16,425,368
Also, the addition to tax under section 6653(a)(2) *273 for 1981, 1982 and 1983 remains in dispute. On July 7, 1960, petitioner received a ruling from the Internal Revenue Service (IRS) that it was exempt from Federal income tax under section 501(c)(3). The Commissioner revoked petitioner's tax exemption retroactively to fiscal year 1977 and determined the deficiencies listed above. Petitioner does not contend in this case that it is tax-exempt. Petitioner engaged in numerous income-producing activities, some of which are stipulated to be trades or businesses, and some of which are not. The issues to be decided are as follows: 1. Whether petitioner's books and records should be considered in their entirety to determine deductible expenses as contended by petitioner, or whether the Court should limit its consideration primarily to the Adgap General Ledgers and the supporting records for those ledgers, as contended by respondent. 2. Whether section 277 has any applicability to petitioner, and who bears the burden of proof on this issue. 3. Whether petitioner's Schedule M Receipts of cash contributions should be included in gross income or excluded as gifts. 4. Whether food and clothing obtained by petitioner through the Synanon Distribution *274 Network and consumed by petitioner should be included in gross income or excluded as gifts. a. If included, what value should be given the donated goods. b. If included, what expenses, if any, should be allowed against such income. 5. Whether expenses incurred in five activities of petitioner that were not stipulated to be trades or businesses are deductible: The Synanon Distribution Network, Lifestyler Operations, Education/School, Corporate Investment and Realty, and Education/Rehabilitation. 6. Whether certain cash payments (Executive Compensation and Other Salaries and Wages) to Synanon residents who worked for petitioner are deductible as compensation. 7. Whether certain amounts expended for insurance, utilities and property expense, medical care, clothing, meals, and vehicles are deductible as in-kind compensation to employees. 8. Whether petitioner is entitled to deductions for depreciation, interest and taxes and, if so, in what amounts. 9. Whether, the following line items, expenses not stipulated as deductible, were incurred in furtherance of petitioner's trade or business activities: Printing, Postage and Office Supplies, Minor Consumables, Air fares, Telephones, *275 and Professional Fees. 10. Whether petitioner is liable for the addition to tax under IRC section 6651(a)(1) for failure to file returns for fiscal years ended August 31, 1980 to August 31, 1983. 11. Whether petitioner is liable for the addition to tax under IRC section 6653(a) for negligent underpayment of taxes for fiscal years ended August 31, 1977, through August 31, 1981 and for the additions to tax under sections 6653(a)(1) and 6653(a)(2) for fiscal years August 31, 1982 and August 31, 1983. 12. Whether petitioner is liable for the addition to tax under IRC section 6655 for underpayment of estimated taxes for fiscal years ended August 31, 1980 to August 31, 1983. FINDINGS OF FACT A. General Petitioner was incorporated under the nonprofit corporation laws of California on September 18, 1958, with the name Synanon Foundation, Inc. On November 24, 1980, its name was changed to The Synanon Church (hereinafter Synanon or petitioner). At the time the petition was filed, Synanon's principal place of business was in Badger, California. For the years before the Court, petitioner adopted a fiscal year ended August 31. In its early years, Synanon conducted rehabilitation activities *276 at several locations for drug addicts, alcoholics, juvenile delinquents and other character-disordered persons. Character-disordered individuals were maintained in self-contained communities where they were denied alcohol and drugs, were given work assignments they were required to perform, and were provided with a form of psychological therapy through what was referred to as the Synanon Game. Residents of the communities were provided with total care and subsistence, including food, housing, medical care, and recreational facilities. In December 1959, Synanon stated in a letter to the Internal Revenue Service (IRS) that 44 of its 49 residents were former narcotic addicts. On July 7, 1960, petitioner received a ruling by the IRS that it was tax-exempt under section 501(c)(3) and that contributions to it were deemed tax-deductible under section 170. As a result of an IRS audit of Synanon's fiscal years 1969, 1970, and 1971, the Commissioner determined that one of Synanon's activities, its Advertising Gift and Premiums activity (Adgap), was a business unrelated to its charitable activities and was subject to the section 511 unrelated business income tax. Petitioner filed Forms 990, *277 Return of Organization Exempt from Income Tax, for its fiscal years 1977, 1978, and 1979 and Forms 990-T, Exempt Organization Business Income Tax Return, for 1979, 1980, 1981, 1982, and 1983 on which it reported some of its Adgap income. The only years for which petitioner filed Forms 1120, U.S. Corporation Income Tax returns, were the fiscal years 1977 and 1978. By the beginning of its fiscal year 1977, Synanon's character and activities had changed substantially. During some or all of the fiscal years 1977 through 1983, Synanon carried on the following 13 for-profit business activities in addition to Adgap: Trucking Land and Livestock Ranching Graphics and Direct Mail Ceramics General Store Construction Contracting Band Texaco Station Salvage and Recycling Bus Service Data Processing Publishing Public Safety The parties have stipulated that expenses are allowed as a deduction in an amount equal to the revenues derived from these non- Adgap activities and that no other expenses are attributable to them. These 13 activities had total income of $ 1,440,346 during the seven years in controversy. Adgap was a trade or business which engaged in the sale of promotional products and programs *278 to business and other organizations throughout the United States. In Adgap's beginning, its products were marketed by door-to-door salesmen. During the years in controversy, its sales methods included door-to-door canvassing, telephone sales and appointment sales. Revenues generated by Adgap are set forth in the following schedule: Year
Gross Receipts or Sales
1977
$  9,187,721
1978
9,777,680
1979
9,429,480
1980
7,405,695
1981
9,366,490
1982
10,543,889
1983
9,964,617
Total
$ 65,675,572
The parties have stipulated that all amounts expended in furtherance of Adgap's business are deductible expenses. In addition to the foregoing stipulated trades or businesses, petitioner engaged in the following activities: (a) The Synanon distribution Distribution Network (b) Lifestyler Operations (c) Education/School (d) Corporate Investment and Realty (e) Education/Rehabilitation The parties are in dispute as to whether the first four of these activities are section 162(a) trades or businesses. In its brief, petitioner has conceded that the Education/Rehabilitation activity, carried on by its Newcomer Department, is not a section 162(a) trade or business. The following table shows the approximate number of Synanon *279 residents at the end of each of the fiscal years before the Court: Fiscal Year Ended
August 31
Number
1977
1,301
1978
891
1979
812
1980
774
1981
634
1982
571
1983
559
The residents may be classified into three categories: (1) Individuals who came to Synanon with histories of drug addiction, alcoholism or juvenile delinquency, referred to as character-disordered; (2) individuals who resided and worked in the community because they were attracted to its stated purpose and lifestyle and families of some of the character-disordered persons, referred to as Squares; and (3) residents who lived in the community because they were attracted to its stated purpose and lifestyle but who worked for employers outside the Synanon community, referred to as Lifestylers. The approximate number of character-disordered persons who entered Synanon for help during the fiscal years in controversy are as follows: Fiscal Year Ended
August 31
Number
1977
1,042
1978
534
1979
275
1980
156
1981
82
1982
107
1983
166
These figures do not reflect how long the character-disordered persons who entered a Synanon community during any year lived there or what proportion of the total number of residents were character-disordered persons living in the community *280 at any given time. On May 19, 1982, the Commissioner sent petitioner a notification of the revocation of petitioner's exempt status; the notice referred only to the years 1977 and 1978. On August 16, 1982, petitioner filed a section 7428 declaratory judgment action in the United States District Court for the District of Columbia seeking a review of the revocation of the recognition of exemption. On February 9, 1984, the district court dismissed the declaratory judgment action. On June 5, 1987, the United States Court of Appeals for the District of Columbia affirmed the dismissal. Synanon Church v. United States,579 F.Supp. 967 (D. D.C. 1984), affd. 820 F.2d 421 (D.C. Cir. 1987). The parties have stipulated that petitioner does not contend that it was or should be tax-exempt under any provision of the Internal Revenue Code during the seven years here in controversy. The parties have stipulated that petitioner had the following amounts of income from designated sources during the fiscal years in controversy: 1977
$ 11,319,823
1978
13,648,590
1979
12,441,080
1980
8,151,178
1981
12,140,322
1982
13,016,300
1983
11,027,008
Total
$ 81,744,301
The amounts of income in dispute are set forth in the findings *281 on "Taxability of Transfers of Cash and Property to Petitioner," infra.
The parties have also stipulated that petitioner had the following total amounts of expenses which are deductible in computing its taxable income: 1977
$  8,015,204
1978
8,307,830
1979
7,673,623
1980
5,850,957
1981
7,543,572
1982
8,005,948
1983
7,822,004
Total
$ 53,219,138
The following schedule sets forth the expense items which petitioner claims as deductions and which are in dispute: SCHEDULE D -- EXPENSES NOT STIPULATED AS DEDUCTIBLE
LINE ITEM                    FYE
1977
1978
1979
1980
Executive Compensation
812,000
409,078
290,309
248,892
Other Salaries & Wages
488,723
555,583
1,120,579
1,454,501
WAM Expenses
124,000
44,100
57,500
31,400
Taxes
90,108
76,505
119,930
122,372
Interest
353,625
280,518
203,360
113,141
Depreciation
761,594
691,578
596,996
522,836
Insurance
46,150
50,554
21,266
58,125
Utility & Property Expense
498,237
630,403
463,739
626,475
Medical, Clothing & Other
Resident Expenses
252,580
222,895
166,564
269,514
Meals
706,314
434,817
421,225
524,855
Vehicles
443,184
333,090
356,280
333,134
Attributed SDN Expense
643,888
755,933
688,726
572,739
Professional Fees
17,379
81,103
437,573
1,603,628
Other General & Admin-
istrative Expenses
27,501
45,835
56,612
32,824
Printing, Postage & Office
47,653
126,493
81,330
95,398
Minor Consumables
242,623
102,773
0
0
Airfares
47,374
85,156
130,495
40,709
Telephones
195,193
187,004
172,390
109,426
SUBTOTALS
5,798,126
5,113,418
5,384,874
6,759,869
Less: Other Amounts
Stipulated Deductible
578,942
270,685
254,449
80,797
TOTALS
5,219,184
4,842,733
5,130,425
6,679.072
*282 LINE ITEM
1981
1982
1983
TOTALS
Executive Compensation
552,594
274,488
509,156
3,096,517
Other Salaries & Wages
1,100,887
892,112
1,423,786
7,036,171
WAM Expenses
12,500
9,800
14,600
293,900
Taxes
100,329
92,441
69,550
671,135
Interest
110,161
104,591
256,812
1,422,208
Depreciation
509,939
536,936
842,766
4,462,645
Insurance
18,921
29,096
20,295
244,407
Utility & Property Expense
603,146
456,677
407,694
3,686,371
Medical, Clothing & Other
Resident Expenses
182,595
197,914
256,581
1,548,643
Meals
291,274
222,494
352,216
2,953,195
Vehicles
345,339
371,318
200,205
2,382,550
Attributed SDN Expense
710,141
674,312
504,163
4,549,902
Professional Fees
1,256,440
676,540
795,440
4,868,103
Other General & Admin-
istrative Expenses
37,687
15,182
11,805
227,446
Printing, Postage & Office
72,073
113,915
127,042
663,904
Minor Consumables
0
0
0
345,396
Airfares
20,033
6,321
10,627
340,715
Telephones
110,179
128,238
106,256
1,008,686
SUBTOTALS
6,034,238
4,802,375
5,908,994
39,801,894
Less: Other Amounts
Stipulated Deductible
90,549
109,580
55,344
1,440,346
TOTALS
5,943,689
4,692,795
5,853,650
38,361,548 B. Synanon's Books and Records Synanon's books and records for the period here in controversy were maintained under the assumption that Synanon was exempt from income taxes. Synanon maintained a separate ledger *283 for Adgap. In this ledger Synanon recorded Adgap's income, directly attributed Adgap expenses, and certain amounts of allocated overhead or indirect expenses such as executive compensation, labor, rent, utilities, interest, advertising and telephone costs. In addition, Synanon maintained a number of subsidiary ledgers, miscellaneous general ledgers and various departmental ledgers. Neither the ledgers nor the accounts therein were, as a general rule, related to the several businesses and other activities in which Synanon was engaged. Rather, the accounts were keyed mainly to what Synanon referred to as administrative departments. No attempt was made to keep the books and records as though any part of Adgap or any one of Synanon's other activities was a separate taxable activity unrelated to other activities. The IRS used petitioner's own books and records in determining the deficiencies in dispute. The parties have agreed to the correctness of the amounts of the entries in Synanon's books. C. Applicability of Section 277
Synanon's articles of incorporation, dated August 30, 1958, named the directors who were to serve until their successors were elected by the members. The original *284 set of bylaws, adopted September 25, 1958, stated that the members of the corporation "shall be persons who have demonstrated an interest in the purposes of this corporation" and who are approved by the Board of Directors. An amended set of bylaws, adopted January 15, 1975, contains the following: The members of the Board of Directors of the corporation shall be the members of the corporation and shall have all the powers and rights of members as provided by law. There shall be no other members of the corporation. * * * Residents of facilities owned or operated by the corporation and other persons connected with the corporation who may sometimes be referred to as either residents or members of the corporation, are not members of the corporation and shall not have the rights and powers of members, including the right to vote. * * * The by-laws were amended in 1980, 1981 and 1982 but the membership provisions were not materially changed. Residents of Synanon were required to obey the rules of Synanon. These rules covered such matters as abstinence from sugar, dressing in a particular matter, shaving of heads, vasectomies, and, at one point, changing spouses or partners. The rules evolved *285 as time passed and changed from time to time. The Synanon Game, [3] a practice in the nature of an encounter session, was used by the Synanon management to inform the residents of rules changes and to enforce compliance with them. Residents who did not comply with the rules could be required to leave the Synanon community Synanon provided all residents in its communities with food, clothing, housing, entertainment, educational services, medical care, recreation, certain transportation services, and a form of psychological therapy through the Synanon Game. Residents of the Synanon communities lived communally and shared social and recreational activities. All Synanon residents were required to do the work needed to provide these services *286 as well as to carry on the several business and nonbusiness activities in which Synanon engaged. Character-disordered persons who had lived in Synanon less than three years, minor children and retired persons received weekly or monthly cash allotments (referred to as Walk Around Money or WAM). These allotments began at about 50 cents per week and gradually rose to $ 4 to $ 5 per week by the end of three years. Most individuals who had lived and worked in Synanon for more than three years received a monthly salary which averaged $ 34 per month and, in some cases, ranged to $ 75 or $ 100 per month during the years before the Court. Members of the Board of Directors and other Synanon officers received what was referred to as executive compensation. Petitioner made all decisions as to job placement, level of compensation, and vacation and training for all Synanon residents. No contractual arrangements existed between petitioner and the Synanon residents giving them any interest in the ownership of Synanon or any of its assets. The Synanon residents have no rights to a distribution of any Synanon property at the termination of their residency and no right to restoration of any money *287 or property they may have contributed to Synanon while they lived there. Synanon residents are free to terminate their residency at any time and the Synanon management may at any time require them to leave. Synanon's principal objective during the seven years before the Court was the successful operation of its numerous business and nonbusiness activities. Valuable property was acquired and some of it profitably sold. Business income was increased and larger cash distributions were made to the long-term executive group. Synanon was not operated primarily to furnish services or goods to its members during the years in issue. D. Taxability of Transfers of Cash and Property to Petitioner During the seven years before the Court, petitioner received cash contributions (sometimes Schedule M Receipts) and income attributed to its Synanon Distribution Network (SDN). The taxability of the following income items totaling $ 5,514,642 is in dispute: Income Item
Schedule M
Attributed
FYE
Receipts
SDN Income
Total
1977
$ 218,381
$   643,888
$   862,269
1978
177,824
755,933
933,757
1979
322,953
688,726
1,011,679
1980
50,131
572,739
622,870
1981
102,094
710,141
812,235
1982
64,581
674,312
738,893
1983
28,776
504,163
532,939
Total
$ 964,740  $ 4,549,902
$ 5,514,642
(1) *288 Cash Contributions
Petitioner excluded cash contributions and donations from its gross income during the years before the Court by making a Schedule M adjustment. These cash contributions came from (a) relatives of residents, (b) bequests, and (c) individuals and foundations associated with petitioner. (2) Contributions of Goods (Attributed SDN Income)
Through an internal department which was known as Synanon Distribution Network (SDN), more fully described below, separately incorporated in May 1983, petitioner actively sought and obtained donations of cash, food, clothing and other items. Some of the food, clothing and other goods were retained by petitioner and used in its operations. Some of the contributed items were passed on to section 501(c)(3) charitable organizations. (See E(1), The Synanon Distribution Network, infra.) The food and clothing contributed to petitioner and not passed on to others were, for the most part, consumed within the taxable year in which the goods were received. Respondent determined, and petitioner denies, that the value of the food and clothing consumed by the Synanon residents is includible in petitioner's gross income. Respondent did not include *289 in petitioner's income the value of goods which Synanon passed on to section 501(c)(3) tax-exempt organizations. In soliciting contributions of goods, Synanon stressed that it had a section 501(c)(3) exemption ruling and that contributions to Synanon would be deductible. In particular, it emphasized the provisions of section 170(e)(3) which permits donors of inventoried goods to obtain charitable deductions for property in an amount equal to its basis plus 50 percent of the normal markup. Petitioner made purchases of food and clothing for its population at wholesale prices. Costs of providing food and clothing were, therefore, somewhat less than they otherwise would have been. The IRS determined the value of the consumed food and clothing by using the Department of Labor, Bureau of Labor Statistics, cost of living statistics on costs of food and clothing at the low standard for the community nearest Synanon for which statistics were available. These figures were applied against Synanon's average yearly number of residents as determined from petitioner's records. Synanon's actual expenditures for food and clothing were then deducted from the Bureau of Labor Statistics figure, and *290 the resulting difference was included in income. In this manner, the IRS determined petitioner's taxable income from the SDN for the years in controversy. E. Whether Certain Activities Were Trades or Businesses (1) The Synanon Distribution Network
In addition to actively seeking contributions of food, clothing, computers, lumber and other items which were used in the operation of the Synanon community, petitioner through SDN, from September 1, 1977, through May 1982, obtained contributions of goods which it distributed to charitable organizations. Some items were shipped directly from donors to the charities. Petitioner sought contributions through personal conferences with representatives of potential donors, by direct mailing, by public speaking engagements, by telephone and through the work of Adgap salesmen. In seeking contributions, Synanon emphasized its tax-exempt status and charitable activities in catalogs published primarily to promote Adgap's business. A letter signed by Macyl A. Burke, included in the 1978-1979 catalog, for example, contained the following paragraph: One final note of interest to businessmen. The Synanon Distribution Network, our nonprofit, national *291 service which delivers surplus material to people in need, has grown at a tremendous rate and expects to distribute between 7 and 8 million dollars worth of goods to reputable charities in 1978. Let me urge you to examine the special brochure inserted in the catalog to find out how the Distribution Network can help you dispose of your surplus and overruns and may actually increase your profits at the same time. The brochure referred to in this paragraph is entitled "A 3-Minute Introduction to The Synanon Distribution Network." The statement described SDN as "a nonprofit service of Synanon which includes more than 25,000 businessmen, manufacturers and farmers who trust us as their primary outlet for large quantities of surplus materials, overruns and distressed merchandise." The brochure explains that a company may benefit from contributions because companies, under section 170(e)(3) "may now deduct their cost plus 50% of the gross profit of the donated goods." In the catalog for 1980-1981, SDN is described as a "nonprofit organization working hard to give people a hand instead of a hand-out." The catalog states that "We provide [businessmen] an outlet for their surplus, which allows *292 them to clear their warehouses, receive a tax deduction, and help disadvantaged people -- all at the same time." Revenues received by SDN for the period August 31, 1977, through May 1982 for passing goods along to charities were as follows: 1977
$       0
1978
0
1979
0
1980
1,580
1981
103,020
1982
219,019
1983
0
In 1980, when Synanon began making charges for handling SDN distributions, Synanon management discussed the "semantics" to be used to describe the charge and the suggestions included "handling charge," "committed contribution" and "finders fee." In a letter dated December 5, 1980, the vice-president of SDN stated: 1. We are not really invoicing, because unlike ADGAP, we would never turn the bills over to a collection agency. We are really talking about a commitment for contribution which is analogous to someone pledging $ 100 to Muscular Dystrophy. On July 30, 1982, petitioner transferred SDN to the Game Club of Michigan, a tax-exempt organization. The name of the organization was changed to Synanon Second Market on February 19, 1985. (2) Lifestyler Operations
Petitioner provided room, board and services to persons who were not employed by petitioner but who lived on properties owned *293 by petitioner. These persons were called "Lifestylers" and they paid money to petitioner for providing these services. The Lifestylers were advised that payments for room and board were not deductible as a charitable contribution. Petitioner's financial statements recorded Lifestyler revenues as "Resident contributions and room and board: Workouts." When an individual expressed an interest in becoming a Lifestyler, officers or other employees of petitioner met with the individual and worked out the terms of payment. For individuals who became Lifestylers, Synanon incurred expenses for medical care, clothing, meals, use of vehicles and the like. The following table shows the revenues and expenses attributable to the Lifestyler activity:
Lifestyler Business Revenues and Expenses
Lifestyler
Workout
Net Gain from
FYE
Revenues
Expenses
Lifestyler Operations
1977
$   574,506
$ 117,668
$ 456,838
1978
248,609
42,437
206,172
1979
99,934
50,394
49,540
1980
43,707
19,909
23,798
1981
18,966
3,841
15,125
1982
66,851
42,088
24,763
1983
100,065
99,752
313
Total  $ 1,152,638
$ 376,089
$ 776,549
The Lifestyler activity was conducted primarily as a recruiting device to attract people with social philosophies consistent with Synanon's *294 and was not a trade or business. (3) Education/School
Petitioner provided nursery age through post-graduate education, including the Charles E. Dederich School of Law. At a very early age, all children were placed in what was referred to as a boarding school where they ate and lived and, when they became old enough, received instruction. Their parents were, in this manner, freed of the responsibility of taking care of their children and were enabled to take appropriate work assignments in the community where the school was located or elsewhere. Petitioner obtained grant moneys from state and local governments and from private sources to educate some youngsters. Lifestylers paid to have their children educated in the school. Payments were made by some parents who did not reside in the Synanon community to have their children enrolled in the school. The Education/School activity was not a trade or business. (4) Corporate Investment and Realty
Before and during the years in issue, petitioner purchased, used, developed and sold real property and realized a profit on most sales. Petitioner maintained records from which its basis, allowed and allowable depreciation, and gain or loss *295 on the sale of such properties could be determined. In developing or improving the properties, petitioner used the services of civil engineers, architects, landscape designers, skilled craftsmen and executives. During the years in issue petitioner sold 20 pieces of property for a total net gain of $ 6,617,101. The parties have stipulated that the income derived from these sales was capital gain. The amounts of capital gains or loss realized from these real estate sales in fiscal years 1977, 1978, 1979, 1980, 1981 and 1982 are as follows: Capital Gain (or Loss)
1977
$  (208,979)
1978
2,420,825 1979
2,176,556 1980
74,390 1981
1,549,373 1982
604,936 Total Net Gain
$ 6,617,101 No real property was sold in fiscal year 1983. In addition, petitioner rented apartments and received gross rents of $ 841,293. As petitioner had funds available, it invested the funds in certificates of deposit, treasury bills, stocks and other instruments. Petitioner set up an investment office to manage its portfolio and, incidentally, to provide investment services to those residents who had funds to invest and who wanted advice. In total amounts, petitioner had income of $ 420,379 from dividends, $ 512,102 from *296 interest on U.S. obligations, and $ 1,461,220 from other interest during the seven years before the Court. F. Cash Payments to Synanon Residents (1) Executive Compensation
The following table shows the amounts of cash petitioner paid as executive compensation to its officers and directors during the fiscal years 1977 through 1983, the amounts allowed by respondent as deductions, and the numbers of executives receiving that cash compensation: Amounts
Numbers of
FYE
Amount
Allowed
Executives
8/31/77
$ 815,260
$   3,260
14
8/31/78
426,103
17,025
17
8/31/79
308,433
18,124
13
8/31/80
313,470
64,578
15
8/31/81
736,594
184,000
16
8/31/82
366,488
92,000
19
8/31/83
679,156
170,000
18 For fiscal year 1977, Synanon paid Charles E. Dederich, the founder of Synanon, a total amount of $ 575,000, including a $ 500,000 pre-retirement bonus. For fiscal year 1978, petitioner paid Dederich $ 100,123. Excluding the $ 500,000 bonus, the amounts were paid to Dederich as salary pursuant to the September 1, 1976, lifetime employment and consultation agreement described infra. Additional amounts were paid to Dederich under this September 1, 1976, employment agreement; however, petitioner claims a deduction only for the $ 575,000 and $ *297 100,123 amounts. [4] The executives who were paid the cash compensation were involved in the supervision and management of all of petitioner's affairs and activities. Synanon was organized into departments which performed assigned functions. Each of the departments reported to a member of Synanon's Board of Directors or a member of the board's executive committee. Prior to 1976, nominal payments of cash salary were made by petitioner to its officers and directors. Beginning *298 in late 1975, Dederich in discussions with Synanon's directors, decided the time had come to pass out some of the organization's cash to himself and certain other Synanon people. A transcript of a directors' meeting of December 11, 1975, shows that the directors decided that this could best be done in the form of salaries because nonprofit corporations are legally prohibited from distributing their assets or profits to private individuals. During these discussions, the transcript shows, the participants considered establishing a separate, for-profit corporation called Home Place Investors, Inc., which over the course of time would acquire petitioner's more valuable assets. The transcript also shows that the amounts paid out as salaries would be used to capitalize Home Place Investors, Inc. [5] *299 *300 *301 Dederich in the course of these discussions with Synanon's directors, according to the transcript of an April 27, 1976, meeting of the directors, stated that he wanted himself and his wife Betty made totally financially independent for the rest of their lives. [6] Subsequently, the Board of Directors decided that petitioner should enter into a long-term employment and consulting agreement with Dederich. When concerns were raised over the Internal Revenue Service's ability to seize Synanon's assets if it prevailed in the dispute concerning whether Adgap's *302 income was subject to unrelated business income tax, a transcript of a meeting of August 13, 1976, shows that one of Synanon's attorneys suggested that the contract with Dederich be secured by a first deed of trust on Synanon's real estate. [7] *303 This decision to pay larger salaries generally applied only to Dederich and a limited, inner group. [8] *304 *305 Synanon's general counsel suggested, according to the transcript, that another benefit from paying the salaries would be the resulting reduction of Adgap's net income, which possibly would lessen the Internal Revenue Service's interest in taxing Adgap. On August 13, 1976, petitioner's Board of Directors adopted resolutions concerning the salaries to be paid Dederich and other Synanon executives. Dederich was to be paid an annual salary of $ 75,000 effective for petitioner's fiscal year ending August 31, 1976. It was further resolved that petitioner should enter into a lifetime employment and consultation agreement pursuant to which Dederich would receive a $ 75,000 per year salary prior to his retirement and then a $ 50,000 per year consultation fee following his retirement from petitioner's active management. Deeds of trust in Dederich's favor on petitioner's Home Place property and Marshall, California, ranch property were authorized to secure Synanon's obligation to Dederich under the employment and consultation agreement. On September 1, 1976, petitioner and Dederich entered into an employment and consultation agreement along the lines authorized in the August 13, 1976, corporate resolutions. The agreement provided that Dederich would be furnished with the rooms, meals and services necessary to perform his duties. Dederich also received *306 deeds of trust to two real properties of Synanon to secure the agreement in the event of petitioner's default. On February 6, 1980, the two deeds of trust were released to petitioner. The minutes of an August 15, 1977, meeting of Synanon's executive committee include a resolution that Synanon pay Dederich $ 500,000 cash immediately as a pre-retirement bonus. An October 20, 1978, resolution of Synanon's board states that at a prior meeting on October 20, 1977, a decision was made to increase Dederich's salary under the employment and consultation agreement to $ 100,000 a year. The resolution states the board determined that it was in the best interests of petitioner to amend the employment agreement to pay the increased compensation and ratifies and affirms the acts of its officers and directors in paying Dederich $ 100,000 per year beginning September 1, 1977. The post-retirement $ 50,000 per year consultation fee arrangement remained unchanged. On the Forms 990-T (Exempt Organization Business Income Tax Return), petitioner filed for its fiscal years 1981, 1982 and 1983, it allocated 25 percent of the cash executive compensation paid for each fiscal year to Adgap. On these 990-T's, *307 Synanon treated only the portion of its Adgap sales which was attributable to outside sales commission representatives as unrelated business income subject to tax. It further allocated and took as a deduction only the portion of the Adgap executive compensation attributable to sales by the outside sales representatives. For example, on the 990-T for its fiscal year ending August 31, 1982, from the $ 77,275 of gross Adgap sales of the outside sales representatives which it reported as unrelated business income, Synanon took a deduction of $ 641 for the executive compensation directly connected to such unrelated business income. The $ 641 deduction was based on the ratio of the commission representative sales to total reported Adgap sales for the fiscal year. (366,488 total compensation X 25% X 77,275 (commissioned representative sales) / 10,401,816 (Adgap sales)) (2) Other Salaries and Wages
The following table sets forth the amounts designated Other Salaries and Wages or Nonexecutive Compensation paid by Synanon for each of the fiscal years in controversy, the amounts allowed by respondent, and the amounts initially in dispute: Initially
Amount
Allowed
Disputed
1977
$   551,087
$    62,364
$   488,723
1978
706,359
150,776
555,583
1979
1,387,693
267,114
1,120,579
1980
1,630,080
175,579
1,454,501
1981
1,406,324
305,437
1,100,887
1982
1,202,570
310,458
892,112
1983
1,617,396
193,610
1,423,786
Total
$ 8,501,509
$ 1,465,338
$ 7,036,171
*308 These salaries and wages were paid to nonexecutive employees. The nonexecutive employees included (1) resident Squares, (2) character-disordered persons who had lived in a Synanon community for a minimum of three years, and (3) employees who worked for petitioner but did not reside in a Synanon community. In its brief, petitioner has conceded that its Education/Rehabilitation activity was not a trade or business. Accordingly, the portion of the nonexecutive compensation paid to employees who worked in its Rehabilitation or Newcomer Department is not deductible. The amount of the concession is $ 51,823 for the seven years. This leaves a total amount of $ 6,984,348 in dispute. Apart from the disputed amount, petitioner has conceded that a total amount of $ 293,000 paid to character-disordered persons who had lived in Synanon less than three years, school children, and retired persons, as WAM or Walk Around Money, is not deductible. Petitioner concedes that the following amounts of WAM are not deductible. 1977
$ 124,000
1978
44,100
1979
57,500
1980
31,400
1981
12,500
1982
9,800
1983
14,600
The nonexecutive employees performed the services required for: the operation of Adgap, the thirteen other *309 activities stipulated to be trades or businesses, the activities which were nonbusiness in character (SDN, Lifestyler Operation, Education/School, and Corporate Investment and Realty) as well as the conceded Education/Rehabilitation activity. These employees also prepared and served food at the community dining room, maintained the housing, provided medical care for the residents and performed other tasks required for the operation of the Synanon community. The average number of people employed by Synanon during the years before the Court was as follows: Fiscal Year Ended
August 31
Number of Employees
1977
636.2
1978
587.1
1979
532.6
1980
502.3
1981
487.2
1982
440.4
1983
420.0
These average numbers were computed by reference to the number of man-months the employees worked during the year. Petitioner maintained records on the cash payments made to its nonexecutive employees. The records, however, were not, in general, related to the several business and nonbusiness activities carried on by Synanon. Instead, the records were related to 41 administrative departments which were used during all or part of the period here in controversy. The records on these departments do not include payments to character-disordered *310 residents who had lived in Synanon less than three years, school children, retired individuals, dependents and individuals receiving executive compensation. Nonexecutive employees were given work assignments in Synanon's several administrative departments. Skill level and work production were factors taken into account in determining pay levels. The nonexecutive employees performed, among other duties, support services for Adgap and other business activities. They solicited business in person and by telephone. They processed and filled orders for goods and billed customers. They kept records on revenues and expenses and performed other needed services. The following table shows the total cash payments to employees of each of the 41 administrative departments during each of the seven years before the Court: 1977
1978
1979
1980
Acquisition
$        .00
$        .00
$     6,360.00
$    15,454.00
Agriculture
7.996.00
6,836.00
12,871.00
19,127.00
CED Archives
5,013.39
8,798.00
6,342.00
20,534.00
Ceramics
1,076.00
1,019.00
159.00
.00
Chairman's
11,508.00
13,347.00
8,170.00
7.987.00
Office
Circus
.00
.00
.00
12,848.00
(Research)
Clerk's Office
25,598.76
14,073.00
32,055.36
40,540.60
Construction
28,802.00
15,846.00
39,220.13
100,932.94
Communications
18,724.20
46,569.15
56,372.27
63,713.41
Director's
11,110.50
118.00
.00
.00
Office
Distribution
.00
17,515.00
31,852.88
46,304.06
School Staff
40,120.82
22,470.45
56,405.18
87,182.96
Entertainment
.00
.00
.00
.00
Executive
24,915.38
27,926.69
76,555.81
67,285.06
Staff
Founders
.00
2,511.00
93,432.66
50,495.32
Food Service
34,502.70
25,487.00
43,663.00
98,297.15
Foremen's
.00
11,757.00
27,971.00
67,949.69
Office
Game Lab.
.00
.00
.00
.00
General Office
54,380.99
192,665.44
363,557.10
384,366.69
Home Staff
5,518.00
.00
.00
.00
Industries
11,838.10
64,336.72
143,036.53
67,161.49
Office
Salesmen
61,079.92
62,621.56
130,546.66
161,337.05
Investment
262.00
5,843.00
750.00
.00
Founders
.00
.00
.00
.00
Law Dept.
24,743.00
28,440.00
105,653.69
165,035.29
Housekeeping
3,224.00
7,283.00
9,499.00
4,907.00
Maintenance
38,345.69
24,344.00
22,556.00
30,425.50
Material/
2,981.00
2,551.00
648.00
.00
Purchasing
Medical Dept.
20,439.00
22,935.00
30,574.00
51,105.96
Lake Havasu
$        .00
$        .00
$     2,406.00
$    66,938.96
Necomer Staff
6,847.00
2,529.00
7,522.50
13,115.00
Public Relations
.00
2,199.00
4,380.00
.00
President's
.00
1,745.00
78.00
10,259.00
Office
Publications
.00
436.00
9,263.29
1,812.00
Research
1,461.59
.00
.00
.00
Public
8,387.02
13,115.10
2,512.00
.00
Safety
Synanon Systems
1,345.00
9,858.00
.00
.00
Texaco
2,733.08
657.00
.00
.00
Station
Supply
49,064.24
17,843.00
7,928.40
16,370.00
Transportation
31,135.00
27,072.00
45,363.00
51.040.55
Visual Comm.
17,935.08
5,612.00
9,989.00
7,554.71
$ 551,087.46
$ 706,359.11
$ 1,387,693.46
$ 1,630,080.39
Less amounts reimbursed by SDN for 1983
*311 1981
1982
1983
Acquisition
$       600.00
$          .00
$          .00
Agriculture
6,703.50
9,465.00
5,480.00
CED Archives
11,845.50
4,750.00
11,575.00
Ceramics
.00
.00
.00
Chairman's
6,679.50
.00
.00
Office
Circus
600.00
.00
.00
(Research)
Clerk's Office
45,663.32
39,103.50
63,933.60
Construction
6,505.50
30,551.58
6,839.44
Communications
33,659.23
61,075.00
40,770.00
Director's
5,850.00
300.00
.00
Office
Distribution
69,088.00
32,777.00
58,611.50
School Staff
39,272.50
27,850.00
59,664.00
Entertainment
.00
50.00
2,525.00
Executive
31,732.50
46,057.50
70,518.00
Staff
Founders
69,463.00
2,050.00
.00
Food Service
76,916.78
57,889.85
85,329.00
Foremen's
111,914.58
182,637.49
244,733.69
Office
Game Lab.
5,531.00
.00
.00
General Office
132,621.94
54,577.80
89,509.51
Home Staff
.00
.00
.00
Industries
157,821.85
91,263.99
127,514.00
Office
Salesmen
271,080.78
203,089.99
412,410.30
Investment
13,385.22
20,820.00
15,413.00
Founders
14,675.00
29,800.00
15,371.00
Law Dept.
132,900.50
178,982.94
251,865.00
Housekeeping
880.00
.00
.00
Maintenance
5,359.00
.00
.00
Material/
.00
.00
.00
Purchasing
Medical Dept.
46,973.48
61,864.92
59,717.82
Lake Havasu
$     9,758.66
$          .00
$          .00
Necomer Staff
518.00
50.00
12,340.00
Public Relations
.00
.00
.00
President's
1,529.00
.00
.00
Office
Publications
.00
.00
.00
Research
.00
.00
.00
Public
.00
.00
.00
Safety
Synanon Systems
24,062.00
9,150.00
35,461.00
Texaco
.00
.00
.00
Station
Supply
1,000.00
.00
.00
Transportation
65,756.25
49,238.72
28,693.30
Visual Comm.
5,977.00
9,175.00
8,801.00
$ 1,406,323.59
$ 1,202,570.28
$ 1,707,075.16
89,679.22
$ 1,617,395.94
*312 G. In-Kind Compensation Petitioner provided both executive and nonexecutive resident employees with housing, meals, clothing, transportation, education services, child care, medical care and other items necessary for subsistence. All resident employees were given job assignments and were expected to perform them. In addition, petitioner provided similar subsistence services for character-disordered persons who had resided in Synanon less than three years, school children, retired individuals, and physically infirm persons; these individuals were not petitioner's employees during the seven years in controversy. Petitioner's contemporaneous records do not separate the costs of providing the various subsistence services to its employees from the costs attributable to nonemployees. Moreover, petitioner's contemporaneous records do not segregate the costs attributable to the employees of the several activities in which petitioner was engaged. The costs of providing the subsistence services to all of its residents are reflected in the following expenses: Item
1977
1978
1979
Insurance
$    46,150
50,554
21,266
Utility &
Property Expense
498,237
630,403
463,739
Medical, Cloth-
ing & Other
Resident Expns.
252,580
222,895
166,564
Meals
706,314
434,817
421,225
Vehicles
443,184
333,090
356,280
Other General
& Admin. Expns.
27,501
45,835
56,612
Totals
$ 1,973,966
1,717,594
1,485,686
*313 Item
1980
1981
1982
1983
Insurance
58,125
18,921
29,096
20,295
Utility &
Property Expense
626,475
603,146
456,677
407,694
Medical, Cloth-
ing & Other
Resident Expns.
269,514
182,595
197,914
256,581
Meals
524,855
291,274
222,494
352,216
Vehicles
333,134
345,339
371,318
200,205
Other General
& Admin. Expns.
32,824
37,687
15,182
11,805
Totals
1,844,927
1,478,962
1,292,681
1,248,796
H. Depreciation The following table shows the composition of $ 4,612,384 of deductions for depreciation claimed for the fiscal years 1977 through 1983 on properties in the indicated categories and the amounts respondent allowed as deductions: Buildings &
Machinery &
Amount
FYE
Improvements
Equipment
Transportation
Total
Allowed
8/31/77
$ 516,144
$      --
$ 245,450
$ 761,594
$     --
8/31/78
512,683
--
178,895
691,578
--
8/31/79
406,701
--
190,295
596,996
--
8/31/80
368,120
30,600
137,616
536,336
13,500
8/31/81
303,898
110,293
146,319
560,510
50,571
8/31/82
328,006
104,617
147,892
580,515
43,579
8/31/83
516,649
157,547
210,659
884,855
42,089 The deductions respondent allowed were for depreciation [expenses] shown on the Adgap books and pertain solely to depreciation for machinery and equipment. The properties for which depreciation is claimed were located at the following sites: Depreciation -- FYE's:
Location
8/31/77
8/31/78
8/31/79
8/31/80
Marin Co., CA
$ 196,000
200,420
196,920
* 222,020
Tulare Co., CA
76,500
121,500
124,200
137,300
Santa Monica, CA
183,044
128,963
18,100
--
Kerhonkson, NY
--
--
--
3,700
Chicago, IL
--
--
500
5,900
Detroit, MI
--
--
--
4,200
Havasu, AZ
--
--
--
1,800
Los Angeles, CA
--
--
5,132
10,200
San Francisco, CA
60,600
61,800
61,850
300
Subtotal
516,144
512,683
406,702
385,420
Unidentified
by location
245,450
178,895
190,294
150,916
TOTAL
$ 761,594
691,578
596,996
536,336
Location
8/31/81
8/31/82
8/31/83
Marin Co., CA
** 197,501
*** 43,579
--
Tulare Co., CA
165,240
318,696
**** 804,097
Santa Monica, CA
--
--
--
Kerhonkson, NY
3,820
640
--
Chicago, IL
--
--
--
Detroit, MI
4,000
--
--
Havasu, AZ
10,417
5,504
17,240
Los Angeles, CA
--
2,745
32,945
San Francisco, CA
371
421
--
Subtotal
381,349
371,585
854,282
Unidentified
by location
179,161
208,930
30,573
TOTAL
560,510
580,515
884,855
*314 Petitioner, during the fiscal years 1977 through 1983, sold 20 of its real properties. Included in the 20 real properties sold were: all of Synanon's depreciable Marin County, California, real properties; all of its depreciable Santa Monica, California, real properties, except the Texaco service station; all of its depreciable Kerhonkson, New York, real property; all of its Chicago, Illinois, depreciable real property; all of its depreciable Detroit, Michigan, real property; all of its depreciable Havasu, Arizona, real property; all of its depreciable Los Angeles, California, real property; and all of its depreciable San Francisco, California, real property other than its Oyster Point property. Not sold were petitioner's depreciable Tulare County, California, Home Place property and Strip property; its Santa Monica, California, *315 Texaco station; and its San Francisco, California, Oyster Point property. Petitioner during its fiscal years 1977 through 1983 had the following depreciation expense on its two Tulare County, California, depreciable real properties (the Home Place and the Strip) and its two San Francisco, California, depreciable real properties (the Oyster Point property and the paint factory sold in February 1980): Year
Tulare County
San Francisco
1977
$  76,500
$ 60,600
1978
121,500
61,800
1979
124,200
61,850
1980
137,300
300
1981
165,240
371
1982
318,696
421
1983
466,464
--
The parties have stipulated that petitioner realized $ 6,617,101 of capital gains income from its real estate sales. (See (E)(4), Corporate Investment and Realty, supra.) In computing such gains, an amount for depreciation allowed was subtracted from Synanon's original cost and cost of improvements. For example, as to the petitioner's Marin County, California, properties, the parties stipulated as follows: Marin County Properties:    Bay Property: 18500 State Route 1, Marin County, CA
Acquired during January 1966: Cost
$ 344,963    Ranch: 6055 Marshall-Petaluma Rd., Marin County, CA
Acquired during October 1970: Cost
$ 643,075    Walker Creek: 4300 Marshall-Petaluma Rd., Marin
County, CA
Acquired during December 1971: Cost
$ 526,963
Total cost for three properties
$ 1,515,001
Sold in April 1981: Sale Price
6,111,989
Total Basis (Cost and Improvements)
6,091,480
Total Depreciation allowed
1,686,700
Total Gain
$ 1,707,209
*316 Synanon's depreciable machinery and equipment during its fiscal years 1980, 1981, 1982 and 1983, consisted of data processing equipment, equipment devoted to Adgap, furniture, office equipment, video equipment, other equipment, livestock and livestock equipment. Petitioner during its fiscal years 1980 through 1983 had the following depreciation on its machinery and equipment: Item
1980
1981
1982
1983
Adgap data processing
$ 13,500
$    -- $    -- $    -- equipment
Church data processing
3,800
-- -- -- equipment
Adgap equipment
-- 69,805
35,455
44,020
Data processing equip.
-- 8,545
--
-- Video equipment
4,750
11,814
15,092
31,282
Furniture
1,000
5,324
17,542
31,340
Office equipment
-- -- 12,346
14,855
Other equipment
-- -- 9,377
25,020
Livestock
6,150
11,938
11,938
7,743
Livestock equipment
1,400
2,867
2,867
3,287
$ 30,600
$ 110,293
$ 104,617
$ 157,547
Synanon, during the years in issue, had a Transportation Department. The vehicle pool maintained by this department included automobiles, trucks, buses, tractors, heavy equipment and motorcycles. In 1974, Synanon established a Safari Club and a Motorcycle Club. In operating the Safari Club, petitioner purchased recreational vehicles and equipment for the use of its residents. By *317 June 1978, Synanon owned 410 motorcycles. Motorcycles in the Synanon fleet were assigned to the Motorcycle Club members. Synanon also, as of May 1983, owned a total of 17 boats. The boats were used for educational and recreational purposes. The Synanon College offered a course in Boating Operations and Maintenance. The boats were also utilized for rescue service in Tomales Bay, Marin County, California. From 1974 to 1980, Synanon owned a total of 15 aircraft. Two of the aircraft were gliders. Three of the aircraft were DeHaviland Beavers. The planes were used extensively in training Synanon residents in a flight school operated by its Education/School department. Petitioner's fiscal year 1977 U.S. Corporation Income Tax Return, dated June 21, 1982, gives the following information concerning the $ 516,144 depreciation deduction Synanon claimed for its buildings, leasehold properties, and mobile homes: Depreciation
Cost or
allowed or
Method of
Life
Date
other
allowable in
figuring
or
Depreciation
acquired
basis
earlier yrs.
deprec.
rate
for this yr.
Buildings
various
$ 9,985,739
$ 2,009,301 S/L
various
$ 399,800
Leasehold
properties
various
2,423,345
791,715 S/L
20 yrs.
83,644
Mobile homes
various
564,722
10,338 S/L
10 yrs.
32,700
Bldgs. sold
in 1976
--
--
(216,503)
--
--
--
*318 Petitioner's fiscal year 1978 U.S. Corporation Income Tax Return gives the following information on the $ 535,983 depreciation deduction on buildings, mobile homes and leasehold properties. Depreciation
Cost or
allowed or
Method of
Life
Date
other
allowable in
figuring
or
Depreciation
acquired
basis
earlier yrs.
deprec.
rate
for this yr.
Buildings
various
$  8,956,481 $ 2,192,600 S/L
various
$ 420,100
Leasehold
properties
various
613,356 43,038 S/L
10 yrs.
60,120
Mobile homes
various
2,423,345 875,359 S/L
20 yrs.
55,763
Bldgs. sold
in 1976
--
(2,423,345)
(1,524,222)
--
--
--
I. Taxes, Licenses and Interest The following table shows the taxes, license and registration fees, and interest paid by petitioner during its 1977 through 1983 fiscal years and the amounts allowed by respondent as deductions: Real and
Other Taxes
Personal
Licenses and
Amount
Year
Property Tax
Registration
Interest
Allowed
1977
$  79,099
$ 43,195  $ 353,625
$ 32,186
1978
71,496
6,714    280,518
1,705 1979
115,269
14,897   203,360
10,236
1980
121,680
754   113,141
162
1981
99,103
2,770   110,161
1,544
1982
93,815
(821)  114,684
10,646
1983
49,871
21,789   256,812
2,110 The amounts allowed by respondent were for taxes and interest expenses listed on the Adgap books. J. Printing, Postage *319 and Office Expense; Minor Consumables; Air fares and Telephone The following table shows the amounts paid by petitioner during its 1977 through 1983 fiscal years for printing, postage and office expense; minor consumables; air fares and telephone: Printing
Postage
Minor
Year
& Office
Consumables
Air fares
Telephone
1977
$ 133,337
$ 242,623
$ 127,365
$ 437,409
1978
191,054
102,773
212,701
684,565
1979
207,993
--
231,705
498,172
1980
163,678
--
100,813
405,057
1981
178,530
--
106,013
440,474
1982
232,453
--
126,085
539,118
1983
274,315
--
112,792
355,966
Respondent allowed as deductions the following amounts for the above expenses: Printing,
Postage
Minor
Year
& Office
Consumables
Air fares
Telephone
1977
$  85,684
--
$  79,991
$ 242,216
1978
64,561
--
127,545
497,561
1979
126,603
--
101,210
325,782
1980
68,280
--
60,104
295,631
1981
106,457
--
85,980
330,295
1982
118,538
--
119,764
410,880
1983
147,273
--
102,165
249,710 K. Professional Fees During its 1977 through 1983 fiscal years, petitioner paid $ 4,312,092 of professional fees. This $ 4,312,092 was expended for legal fees, expenses, witness fees, audit fees, petty cash expenditures, attorneys' fees, attorney expenses, settlements, trust account reimbursements and expenses of Synanon's in-house law department. *320 The in-house law department expenses consisted of expenditures for petty cash, publications, travel, goods and lodging. The following table shows the types of cases in which some of the fees were paid, the fees which petitioner concedes are nondeductible, and the fees the deductibility of which is disputed: Adgap and
Conceded by
Libel
Property
Collision
Petitioner as
FYE
Cases
Cases
Cases
Nondeductible
Disputed
8/31/77
$       -- $   2,812
$  26,238
$   5,095
$    12,284
8/31/78
--
19,983
22,963
81,103 -- 8/31/79
48,400
24,537
36,736
82,986
354,587
8/31/80
331,910
55,903
29,620
365,248
1,238,380
8/31/81
359,421
26,722
25,797
15,169
1,241,271
8/31/82
188,775
74,754
6,986
3,731
672,809
8/31/83
42,987
125,348
5,399
2,679
792,761
Total
$ 971,493
$ 330,059
$ 153,739
$ 556,011
$ 4,312,092 Respondent agrees the libel cases fees are deductible, except to the extent section 277 applies and limits their deductibility. Respondent also agrees the property cases and the Adgap and collision cases fees are deductible. Of the $ 4,312,092 of disputed fees, $ 971,493 has not been attributed to particular cases, matters or expenditures. The remaining $ 3,340,599 of fees were paid in the following cases, matters or expenditures: FYE
FYE
FYE
FYE
8/31/77
8/31/78
8/31/79
8/31/80
1) Apar Guardianship
$     71
$   --
$      20
$       20 2) Arizona
--
--
--
-- 3) Benjamin
--
--
--
-- 4) CED Defense Fund
Reim.
--
--
--
(113,645)
5) CIR I
--
--
--
-- 6) Confidential
Settlement
--
--
--
503,977 7) Crawford
--
--
1,091
-- 8) Eidson
--
--
--
-- 9) Excise Tax
--
--
10,685
-- 10) Expense Reim.
Law Dept.
--
--
--
-- 11) FOIA
--
--
--
-- 12) Gambonini
605
--
725
2,843 13) Guardianship/Chil-
dren Legal Fees
--
--
--
-- 14) Home Place Petty
Cash
--
--
--
4,049 15) IRS
--
--
--
-- 16) Kerhonkson Petty
Cash
--
--
--
408 17) Kohl
--
--
--
-- 18) Los Angeles Petty
Cash
--
--
--
312 19) Lukjanczyk
--
--
--
98 20) Macready Estate
--
--
--
557 21) Marino & Smith
--
--
665
774 22) Morantz
--
--
269,930
216,561 23) Morantz/State of
California
--
--
--
159,120 24) Mulrooney
--
--
--
5,215 25) Office Expense
--
--
--
31,242 26) People v.
Dederich et al
--
--
10,871
-- 27) Petty Cash Expense
Law Department
--
--
--
331 28) Publications Law
Department
768
--
153
(5,777)
29) Pub. Exp. Morantz
Law Department
--
--
--
44 30) Ross
--
--
--
1,847 31) San Francisco
Petty Cash
--
--
--
674 32) State of California
--
--
10,975
100,766 33) Strip.
--
--
--
191 34) Superior Court
(Tulare)
--
--
1,072
-- 35) Synanon Atty's
Expense
--
--
--
2,098 36) Reclassification
--
--
--
(23,700)
37) Tolchin
10,840
--
--
1,936 38) Tomales Bay
Petty Cash
--
--
--
13,438 39) Travel, Food &
Lodging -- Law Dept.
--
--
--
3,091 Total
$ 12,284
0
$ 306,187
$ 906,470 *321 FYE
FYE
FYE
8/31/81
8/31/82
8/31/83
Total
1) Apar Guardianship
$      -- $      -- $      -- $       111
2) Arizona
-- -- 641,014 641,014
3) Benjamin
72,877 8,095 42,267 123,329
4) CED Defense Fund
Reim.
(47)
-- -- (113,692
5) CIR I
-- -- 60 60
6) Confidential
Settlement
5,000 445,317 -- 954,294
7) Crawford
-- -- -- 1,091
8) Eidson
-- (317)
-- (317
9) Excise Tax
-- -- 145 10,830
10) Expense Reim.
Law Dept.
-- -- (26,779)
(26,779
11) FOIA
116 85 -- 201
12) Gambonini
3 -- -- 4,176
13) Guardianship/Chil-
dren Legal Fees
1,590 -- -- 1,590
14) Home Place Petty
Cash
-- -- -- 4,049
15) IRS
-- 639 66,502 67,141
16) Kerhonkson Petty
Cash
-- -- -- 408
17) Kohl
-- 11 -- 11
18) Los Angeles Petty
Cash
-- -- -- 312
19) Lukjanczyk
-- -- -- 98
20) Macready Estate
-- -- -- 557
21) Marino & Smith
660,136 15,291 12,798 689,664
22) Morantz
37,065 -- -- 523,556
23) Morantz/State of
California
12,000 -- -- 171,120
24) Mulrooney
-- -- -- 5,215
25) Office Expense
33,918 -- -- 65,160
26) People v.
Dederich et al
3,520 -- -- 14,391
27) Petty Cash Expense
Law Department
20,695 19,059 13,537 53,622
28) Publications Law
Department
19,116 -- -- 14,260
29) Pub. Exp. Morantz
Law Department
-- -- -- 44
30) Ross
-- 465 -- 2,312
31) San Francisco
Petty Cash
-- -- -- 674
32) State of California
12,764 -- -- 124,505
33) Strip.
-- -- -- 191
34) Superior Court
(Tulare)
-- -- -- 1,072
35) Synanon Atty's
Expense
100 435 201 2,834
36) Reclassification
-- -- -- (23,700
37) Tolchin
217 (5,046)
29 7,976
38) Tomales Bay
Petty Cash
-- -- -- 13,438
39) Travel, Food &
Lodging -- Law Dept.
2,780 -- -- 5,871
Total
$ 881,850 $ 484,034 $ 749,774 $ 3,340,599
*322 Synanon received the following amounts of income from settlements or judgments in the indicated cases: FYE
FYE
FYE
Case
8/31/81
8/31/82
8/31/83
Gambonini
$ 987
$    --  $   -- Tolchin
--
--  1,600
Confidential
Settlement
--
475,000
-- The following is a brief description of the cases listed in the foregoing table: The Apar Guardianship involved the establishment of a guardianship over a child by Synanon residents. Arizona involved a state criminal prosecution for securities fraud brought against Dederich and other Synanon executives. Benjamin involved a state criminal prosecution for kidnapping brought against Synanon executive Benjamin and other Synanon residents. CIR I was a suit brought by petitioner in this Court to contest its Federal Insurance Contributions Act (FICA) tax liability. Crawford was a custody suit concerning the two children of a Synanon resident. Eidson was a tort suit brought by a person who alleged that he had been beaten by Synanon residents. Excise Tax was a case involving Synanon's liability for excise tax. FOIA was an action brought by Synanon under the Freedom of Information Act (FOIA) to obtain the information contained in the files of certain government agencies on Synanon. *323 Gambonini was a suit brought by a neighbor of Synanon who was embroiled in a trespass dispute and alleged that she was harassed by Synanon residents. IRS was the tax exemption declaratory judgment action brought by petitioner in the United States District Court for the District of Columbia. Synanon Church v. United States,579 F.Supp. 967 (D.D.C. 1984)
Kohl was a suit brought against petitioner by a former Synanon resident for alleged torts and breach of contract concerning his employment. Lukjanczyk was a conversion suit against Synanon by a former resident over certain wood carvings. McCready Estate involved the collection of a sizeable bequest to petitioner. Marino & Smith were tort suits by persons who had come on or near petitioner's premises and were mistreated by Synanon residents. Morantz and Morantz/State of California involved an attorney, Paul Morantz, who represented a number of former residents in suing petitioner. Two Synanon residents planted a rattlesnake in Morantz's mailbox. Mulrooney was a tort suit by persons who had come upon petitioner's premises and claimed they were beaten and harassed by Synanon residents. People v. Dederich involved the prosecution of Dederich *324 and two Synanon residents for attempted murder by placing a rattlesnake in Paul Morantz' mailbox. Ross involved a suit against petitioner by a former resident who alleged torts and breach of contract. State of California concerned attempts by the California attorney general to place petitioner into receivership or obtain control of Synanon's assets. Superior Court/Tulare was an action brought by Synanon for return of items seized under a search warrant issued in the rattlesnake incident criminal investigation. Tolchin involved a suit brought by former Lifestylers who alleged petitioner had ordered the wife to have an abortion. L. Additions to Tax For all the years before the Court, petitioner was advised that it was exempt from Federal income taxation by the following counsel who were residents of Synanon: Name
Title
Year Licensed
Dan L. Garrett, Jr.
General Counsel
1949
(9/1/76 to 2/12/80)
Howard M. Garfield
Chief Attorney
1969
(9/1/76 to 9/1/78)
Philip C. Bourdette
Attorney
1971
(9/1/76 to 9/1/78)
Chief Attorney
(9/1/78 to 2/12/80)
General Counsel
(2/12/80 to 8/31/83)
David R. Benjamin
Attorney
1973
(all years)
1975 All these attorneys were licensed by the State of California. David R. Benjamin was also *325 licensed by the State of Washington. For the taxable years 1979 through 1983, Garrett, Bourdette and Benjamin advised petitioner that it was under no obligation to file Form 1120, U.S. Corporation Income Tax Return, because of its contention that it was tax-exempt as a church. For all taxable years in issue, petitioner was advised that it had zero tax liability by the following accountants who were residents of Synanon: Name
Year Licensed as CPA
State
Ronald V. Cook
1967
California
Martin Rubenstein
1964
California
David W. Ross
Passed CPA examination
California
1974
For the fiscal years 1977 and 1978, petitioner filed Forms 990 accompanied by letters in which petitioner argued that it generated only "related business income." After the Commissioner revoked its exemption ruling for 1977 and 1978 on May 19, 1982, petitioner filed Forms 1120, U.S. Corporation Income Tax Returns, for 1977 and 1978. For the fiscal years 1979, 1980, 1981, 1982 and 1983, petitioner filed Forms 990-T, Exempt Organization Business Income Tax Return (under section 511 of the Internal Revenue Code ). On these Forms 990-T, petitioner reported that Adgap had the following amounts of gross receipts compared with the gross *326 receipts or sales stipulated in this proceeding: Fiscal Year
Forms 990-T
Stipulated Amounts
1981
$ 282,890
$  9,366,490
1982
77,275
10,543,889
1983
38,544
9,964,617
The computations on these Forms 990-T indicate that petitioner reported on the Forms 990-T only the sales made by outside (nonresident) salesmen. The Forms 990-T contain no references to the other 13 businesses in which petitioner was engaged during the years here in controversy. OPINION During the years before the Court, petitioner carried on a wide variety of activities which produced revenue and which involved expenditures of funds. These activities were headquartered in one or more controlled communities in which the residents performed services and were provided with housing, food at a common dining room, clothing, medical care, education services and other necessities. Before the litigation of petitioner's exempt status was concluded, petitioner contended that all of its activities were exclusively religious or charitable in nature and that, as a church, it was exempt from all Federal income taxes under section 501(c)(3). In the present proceeding, petitioner concedes that it is not tax-exempt for the years in issue and urges *327 that all of its activities with one exception were, in fact, business activities carried on for profit. Petitioner's principal income-producing activity was Adgap. The parties agree that Adgap was a trade or business but dispute the amount of the allowable deductions attributable to it. As to petitioner's 13 non-Adgap activities, the parties have agreed they were trades or businesses, that the expenses are deductible in amounts equal to the revenues derived from them, and that no other expenditures are attributable to those activities. In addition, petitioner engaged in the following five activities: Corporate Investment and Realty, Lifestyler Operations, the Synanon Distribution Network, Education/School, and Education/Rehabilitation. Respondent maintains that petitioner's expenditures in these five activities are not deductible. Petitioner concedes that the Education/Rehabilitation activity was a charitable activity and not a trade or business. Also, petitioner contends that cash and goods donated to Synanon through the Synanon Distribution Network are not taxable and, if taxable, the value of the goods received by petitioner was not as great as respondent has determined. 1. *328 Books and Records Petitioner kept two sets of ledgers, one set for Adgap and, the other, a set of miscellaneous ledgers for all of its other activities. The IRS examined petitioner's books and records and based the deficiency determinations, as modified by the answer, on those books and records. In his opening statement, respondent's counsel stated: Now, the deficiency, your Honor, I want to emphasize, is based on the books and records of the taxpayer, based on their own books and records. There's no dispute in this case as to the amount of any expenditure. There's no dispute in this case as to the amount of any item of income. The only dispute is whether certain expenditures are deductible expenditure [sic]. And there's some dispute as to whether certain receipts are income. A major controversy remaining for resolution is the amounts of the expenses attributable to Adgap. Petitioner argues that the Adgap ledgers do not contain all Adgap expenses and that they were not intended to do so. Rather, petitioner argues, the Adgap ledgers were primarily tools of management which were designed to reflect some of the more controllable expenses. Petitioner contends that its taxable *329 income must be determined by regarding Synanon as a single entity and all of its books and records must be taken into account. Respondent emphasizes that petitioner's officials testified that Adgap's books and records were accurate and complete and were kept in accordance with proper accounting standards. In determining the deficiencies for the years in controversy, the IRS agents relied on those books. On this ground, respondent argues that petitioner has been allowed all the expense deductions to which it is entitled. We agree that Synanon is a single entity and is taxable as such. As we shall discuss (Issue 4, infra), however, a corporation such as Synanon may engage in a variety of activities, some of which are for-profit business activities and some of which are not. The parties have recognized this legal principle by expressly stipulating or asking the Court to decide the business or nonbusiness character of petitioner's several activities. Synanon did not keep separate ledgers in which the income and expenses of each business or nonbusiness activity were separately recorded. We think it quite apparent that the Adgap ledger did not cover all expenses allocable to Adgap. *330 In arriving at the taxable income of Synanon as an entity, certain items of expense must be allocated between the business activities for which expenses are allowable as deductions and the activities for which the expenses are not. Respondent complains that the testimony offered by petitioner on the allocation of the expenditures for executive compensation (Issue 6(a), infra), other salaries and wages (Issue 6(b), infra), and in-kind compensation (Issue 7, infra), was not documented by records made during the years in controversy. That is true. The testimony represented what the witnesses stated was their best judgment in the light of their knowledge of the facts. But any such allocation, of necessity, represents the judgment of the witness and, ultimately, the judgment of the Court. This is the foundation on which the oft-cited rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), rests. The objective of this proceeding is to determine the amount of petitioner's taxable income and its resulting tax liability. Bookkeeping entries "are not determinative of tax liability." Helvering v. Midland Mutual Life Ins. Co.,300 U.S. 216, 223 (1937). Petitioner's ledgers "are no more *331 than evidential, being neither indispensable nor conclusive. The decision must rest upon the actual facts * * *." Doyle v. Mitchell Bros. Co.,247 U.S. 179, 187 (1918). Respondent has cited no law or principle of law, and we know of none, which estops petitioner from showing its true tax liability. Accordingly, we hold that petitioner is entitled to have its tax liability determined in the light of all the facts. 2. Applicability of Section 277
Petitioner seeks to offset the expenses which it incurred in maintaining the self-contained communities in which it carried on its operations against the income which it derived primarily from Adgap. Respondent argues that section 277(a) forbids the reduction of Adgap income by expenses attributable to maintaining the community services and facilities. In the form in which it was effective for the years in issue, section 277(a) contained the following provision: (a) General Rule. -- In the case of a social club or other membership organization which is operated primarily to furnish services or goods to members and which is not exempt from taxation, deductions for the taxable year attributable to furnishing services, insurance, goods, or *332 other items of value to members shall be allowed only to the extent of income derived during such year from members or transactions with members * * *. Deductions disallowed under this provision in one year can be used in succeeding years to offset membership income. The parties agree that for this section to apply: (1) the organization must be a social club or other "membership organization;" (2) it must be operated primarily to furnish services or goods to its members; and (3) it must not be exempt from tax. Although the parties argue at length over who were Synanon members, they expressly or implicitly agree that petitioner meets the first and third of these requirements. The issue is whether petitioner was operated primarily to furnish goods and services to its members. Respondent points out that petitioner furnished a wide variety of goods and services to Synanon residents. A substantial part of petitioner's assets and income and the time of 70 percent of its residents, according to respondent, were devoted to providing those goods and services. To become and remain a resident of Synanon, an individual was required to agree to abide by the rules of the community. Based on *333 these facts respondent argues that Synanon was similar to a social club and was operated primarily to furnish goods and services to its members. The goods and services were furnished to the residents at less than cost, and petitioner seeks to offset the resulting "loss" against the income derived from its profitable Adgap business. Respondent ask us to conclude that section 277, therefore, denies a deduction for the cost of such goods and services in excess of the income received from the members for furnishing them. Petitioner denies that all Synanon residents were members of the corporation and contends that, in any event, Synanon was not operated primarily to furnish goods and services to its residents. Petitioner points to the bylaws of the corporation in effect during the years in issue which provide that "The members of the Board of Directors of the corporation shall be the members of the corporation," and that "Residents of facilities owned or operated by the corporation and other persons connected with the corporation who may sometimes be referred to as either residents or members * * * are not members of the corporation and shall not have the rights and powers of members *334 * * *." The testimony of witnesses confirm that those bylaws were followed. Further, petitioner argues that successful performance of its entrepreneurial activities, which generated over $ 81,000,000 in revenue during the seven years in issue, was its primary objective, and not the furnishing of goods and services to Synanon residents. The residents, petitioner argues, were merely employees of Synanon. They had no voice in Synanon's operations, acquired no proprietary interest in Synanon and could not prevent termination of their residency at any time. On this ground, petitioner maintains that it was not the type of organization described in section 277 and that the section does not, therefore, apply in this case. We hold for petitioner on this issue. Section 277 came into the tax law as section 123 of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 537. The accompanying S. Rept. 91-552 (1969), 1969-3 C.B. 423, 471, explains the reason for enacting the provision as follows: In some cases, membership organizations, which also have business or investment income, serve their members at less than cost and offset this book loss against their business or investment income and as *335 a result pay no income tax. In an important decision, [9] it was held that a non-exempt water company was not subject to tax when the "losses" in supplying its members water offset its investment income. Other courts have held to the contrary. Explanation of provision. -- Both the House bill and the committee's amendments provide that in the case of a taxable membership organization the deduction for expenses incurred in supplying services, facilities or goods to the members is to be allowed only to the *336 extent of the income received from these members. The purpose is to prevent membership organizations from escaping tax on business or investment income by using this income to serve its members at less than cost and then deducting the book "loss." See also H. Rept. 91-413 (Part 1) (1969), 1969-3 C.B. 200, 221. In the words of this Court in Concord Consumers Housing v. Commissioner,89 T.C. 105, 116-117 (1987): The effect of section 277 is to prevent taxable membership organizations from avoiding tax on nonmembership income by operating membership activities at a loss and using this loss to offset the nonmembership income. * * * See also Associated Barbers and Beauticians v. Commissioner,69 T.C. 53, 70-75 (1977). In deciding this issue, we shall not undertake the task of formulating a generally applicable legal standard for determining who is a "member" of a "membership organization" described in section 277. Rather, we rest our decision on the requirement that, for the section to apply, the organization must be "operated primarily" to furnish goods and services to its members. This provision "refers to the manner in which petitioner operated and conducted its activities during *337 the years in issue and entails a factual determination." Armour-Dial Men's Club, Inc. v. Commissioner,77 T.C. 1, 7 (1981), affd. 708 F.2d 1287, 1289 (7th Cir. 1983); Associated Barbers and Beauticians,69 T.C. 53, 74 (1977). We are convinced that Synanon was not "operated primarily" to furnish goods and services to its members regardless of whether the bylaws effectively limited the membership to the Board of Directors or whether all the Synanon residents were members. [10]
Synanon was incorporated in August 1958. In its early years, it was devoted to the treatment of drug addicts, alcoholics, juvenile delinquents, and other character-disordered individuals in its self-sufficient community. In a letter dated December 1, 1959, written in connection with its section 501(c)(3) tax exemption, Synanon represented that 44 of its 49 residents, or 89 percent, were narcotic addicts and, further, that no *338 one, including the members of the Board of Directors, received any compensation. A set of bylaws, adopted September 25, 1958, provides that "Members of this corporation shall be persons who have demonstrated an interest in the purposes of this corporation" and who are approved as members by the Board of Directors. In its early years, it received more than three-fourths of its support from contributions from the general public. During that early period, respondent may be correct in his views that Synanon was operated primarily for the benefit of its residents. By the beginning of fiscal year 1977, the first year here in controversy, however, Synanon's operations had changed dramatically. It had developed extensive nonmembership sources of revenue. Adgap had become a significant business based primarily upon the sale of premiums, advertising gift specialties and promotional items. Its gross sales exceeded $ 65,000,000 during the fiscal years 1977 through 1983 and its profits were substantial. During the same years Synanon also sold 18 pieces of real estate and realized millions of dollars in gains on 13 of the sales. At various times during those years, Synanon carried on other *339 income-producing activities during all or part of those years. The net income derived from these sources was not used in any substantial measure to increase the quantity or improve the quality of the goods and services provided the residents but, as discussed below, was accumulated or distributed in large measure to Dederich and other individuals in the management hierarchy. The Synanon residents, having no proprietary rights, could stay in a Synanon community only with the management hierarchy's permission. They could be pushed out at any time. As we view the evidence, the provision of goods and services to the residents, even if they are regarded as members, had become only an incidental part of Synanon's operations during the years 1977 through 1983. Providing such goods and services was simply one of petitioner's numerous activities. Synanon was operated primarily, though not exclusively, to make a profit from Adgap and other business activities. That profit was intended ultimately to benefit Synanon's founder and an inner group of long-term residents. By no stretch of the imagination could we find as a fact that Synanon was "operated primarily" to provide goods and services *340 to either the Board of Directors or all the residents of the Synanon communities. See and compare Concord Consumers Housing v. Commissioner,89 T.C. 105 (1987); Armour Dial Men's Club, Inc. v. Commissioner,77 T.C. 1 (1981), affd. 708 F.2d 1287 (7th Cir. 1983); Associated Barbers and Beauticians v. Commissioner,69 T.C. 53, 75 (1977). Although other Code sections deny some of the disputed deductions, section 277 does not apply in this case. 3. Taxability of Transfers of Cash and Property to Petitioner Petitioner received donations of cash, food and clothing from a variety of sources which respondent has determined were taxable income. Petitioner has conceded that the following items are income: (1) government support checks surrendered by residents; (2) cash transfers from an organization in Arizona; (3) vehicles turned over to Synanon by incoming residents; (4) receipts from speaking engagements; (5) funds transferred by residents or their families, and (6) cash received from Lifestylers (individuals who lived in the community but worked outside). Respondent does not contend that items donated to Synanon which it transferred to section 501(c)(3) exempt organizations are taxable. *341 In dispute are cash transfers totaling $ 964,740 for the seven years before the Court received in the form of bequests and moneys received from relatives of residents and from individuals and foundations related in one way or another to Synanon. Also in dispute is the taxability of contributed food and clothing determined by respondent to have had a value of $ 4,549,902 over the seven-year period. Respondent contends that these transfers to Synanon were taxable income under the broad provisions of section 61. That section provides that gross income includes "all income from whatever source derived." Petitioner argues that the transfers of cash, food and clothing were nontaxable gifts under section 102. That section provides that gross income "does not include the value of property acquired by gift, bequest, devise or inheritance." By defining gross income to include "all income from whatever source derived," the Congress indicated its intention that income should be taxed comprehensively and, in doing so, intended to exercise to the full measure its constitutional power. Helvering v. Stuart,317 U.S. 154, 169 (1942); Helvering v. Clifford,309 U.S. 331, 334 (1940); United States v. Robertson,190 F.2d 680, 682 (10th Cir. 1951). *342 In view of the general purpose to tax all income, specific exemptions, such as section 102, "should be construed with restraint." Commissioner v. Jacobson,336 U.S. 28, 48 (1949); United States v. Robertson, supra at 682. An examination of the evidence before us in the light of these principles convinces us that the disputed cash and property transfers to Synanon were taxable income. On July 7, 1960, Synanon received the ruling that it was exempt from income taxes under section 501(c)(3) and that contributions to it were deemed tax-deductible under section 170. Not until May 19, 1982, did the Internal Revenue Service notify Synanon that its tax-exempt status was revoked. On August 16, 1982, Synanon initiated a section 7428 declaratory judgment action in the United States District Court for the District of Columbia seeking a review of the revocation. On February 9, 1984, the district court dismissed the declaratory judgment action and on June 5, 1987, the United States Court of Appeals for the District of Columbia affirmed the dismissal. Synanon Church v. United States,820 F.2d 421 (D.C. Cir. 1987). Thus, for all the years in controversy petitioner took the position with the public *343 and in court that it was organized and operated exclusively for charitable purposes within the meaning of section 501(c)(3). During the years before the Court, Synanon aggressively solicited contributions and bequests of cash, food, clothing and other items from the public, including its Adgap customers. Through published materials, [11] *344 in public speaking engagements, and in private meetings, its Adgap salesmen and others placed heavy emphasis on Synanon's addict rehabilitation work and sought money and goods ostensibly to carry on that work. In dealing with customers with food and clothing inventories, Adgap salesmen emphasized the tax deductions they could receive under section 170(e)(3) for contributing such inventories -- their basis for the property plus one-half of the normal mark-up for resale. Under section 170(e)(3), Synanon was required to give a donor a written statement that donated goods would be used only for the ill, needy or infants. [12] *346 The record includes standard letters which were sent to all donors thanking them for their donations and assuring them that their "contributions will be used in accordance with our tax-exempt purposes which are, in the *345 opinion of counsel, solely for the care of the ill, needy or infants." During the period when Synanon was making these representations that it was engaged in exclusively charitable activities, it was operating Adgap and 13 other activities as for-profit businesses. Given the evidence that Synanon represented itself so extravagantly to be an exclusively charitable organization in soliciting contributions of cash and goods and the facts that the contributions of cash went into Synanon's general fund and donated goods were, in large part, used by the Synanon residents, the clear inference is that the donors were misled. They had the mistaken belief that they were contributing to a charity when, in fact, they were donating goods to a predominantly business, profit-seeking organization. In these circumstances, we think the contributions of cash and goods to Synanon were gross income under section 61. The language of section 61, "all income from whatever source derived," has been held to encompass all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 431 (1955); James v. United States,366 U.S. 213, 219 (1961). *347 The economic benefit accruing to the taxpayer is the controlling factor in telling whether a gain is income. Rutkin v. United States,343 U.S. 130, 137 (1952); United States v. Rochelle;384 F.2d 748, 751 (5th Cir. 1967). Synanon realized economic benefits in the form of food and clothing and cash additions to its general fund from the donations it received and used for its own purposes. The situation is analogous to a "lender" who advances funds to a purported borrower of money which the "borrower" falsely promises to return. In a series of cases, the courts have held that the borrower who obtains money which he does not expect to repay is taxable on his "borrowings." United States v. Rochelle, 384 F.2d at 751; Cohen v. United States,297 F.2d 760, 762, 764 (9th Cir. 1962); Leaf v. Commissioner,33 T.C. 1093, 1096 (1960), affd. per curiam 295 F.2d 503 (6th Cir. 1961); see also Akers v. Scofield,167 F.2d 718 (5th Cir. 1948). Similarly, petitioner received contributions which it represented it would use for charitable purposes but it diverted those contributions to its own use. The contributions which it did not pass along to other charitable organizations are taxable income. To *348 support its argument that the cash, food and clothing that it received are not taxable income, petitioner cites Commissioner v. Duberstein,363 U.S. 278, 286 (1960). In that case, the Supreme Court, deciding whether a transfer was a section 102 gift or compensation for services, held that the donor's intent is the controlling criterion, i.e., -- "what the basic reason for his [the donor's] conduct was in fact -- the dominant reason that explains his action in making the transfer." In that context, the Court reasoned that a section 102 gift proceeds from a "detached and disinterested generosity" and "out of affection, respect, admiration, charity or like impulses." See also Commissioner v. Lo Bue,351 U.S. 243, 246 (1956); Robertson v. United States,343 U.S. 711, 714 (1952). Petitioner's argument assumes that, because Synanon's donors were making contributions to an organization with a section 501(c)(3) exemption ruling, the donors had the requisite detached and disinterested generosity. The record contains no testimony from the contributors showing why they made their donations or why the testators made their bequests. [13] Even though the donors made their gifts in response to representations *349 they would be used for charitable purposes, the donors did not testify as to why they made their contributions, and no evidence was presented which was competent to show the intent of the testators who left money or property to Synanon. As pointed out above, petitioner represented to its donors that they could receive deductions sufficient to make their donations profitable. We are not, therefore, prepared to find that the gifts and bequests proceeded from "detached and disinterested generosity" within the meaning of Duberstein. See Webber v. Commissioner,219 F.2d 834 (10th Cir. 1955), affg. 21 T.C. 742 (1954); Publishers New Press, Inc. v. Commissioner42 T.C. 396, 400-401 (1964). More important, we are not convinced that the Duberstein "detached *350 and disinterested generosity" test is the correct one for distinguishing section 61 gross income from section 102 gifts where the donee organization, misrepresenting itself to be a tax-exempt charity, seeks and obtains donations which it plans to, and does, use in carrying on business activities for profit and thereby enriches itself. When the transfer of property without consideration is made to a profit-seeking organization outside of a family setting, a searching inquiry is necessary to ascertain the circumstances of the transfer. The law's policy of exempting charitable organizations from income tax and allowing deductions for contributions to such organizations is based on the purposes and charitable works of the organization. See Crosby Valve & Gage Co. v. Commissioner,380 F.2d 146, 147 (1st Cir. 1967), affg. 46 T.C. 641 (1966). As stated by the Supreme Court in Bob Jones University v. United States,461 U.S. 574, 591 (1983): When the Government grants exemptions or allows deductions all taxpayers are affected; the very fact of the exemption or deduction for the donor means that other taxpayers can be said to be indirect and vicarious "donors." Charitable exemptions are *351 justified on the basis that the exempt entity confers a public benefit -- a benefit which the society or the community may not itself choose or be able to provide, or which supplements and advances the work of public institutions already supported by tax revenues. History buttresses logic to make clear that, to warrant exemption under section 501(c)(3), an institution must fall within a category specified in that section and must demonstrably serve and be in harmony with the public interest. * * * [Fn. refs. omitted.] There is no similar policy supporting the exemption from tax of an organization which obtains donations by misrepresenting itself to be engaged exclusively in charitable activities when, in fact, it is engaged in profit-seeking business activities. Petitioner emphasizes that, when the donors made the transfers, Synanon's name appeared on the Cumulative List of exempt organizations and contributions to it were deductible under section 170. Because Synanon was on the Cumulative List when the donations were made, the argument goes, the character of the donations as nontaxable gifts within the meaning of section 102 was not altered by the revocation of petitioner's tax-exempt *352 status. Petitioner's argument confuses the allowability to donors of deductions for charitable contributions under section 170 with the taxability of contributions in the hands of the recipient. The IRS publishes a Cumulative List of organizations to which contributions may be made and deducted by contributors. Once an organization has received an exemption ruling it is, as a general rule, placed on the Cumulative List, and contributors may rely on the list in claiming deductions. If the character, purpose, activities or method of operation of the organization itself changes from those on which the ruling was based, the organization ceases as a matter of law to qualify as a tax-exempt organization. Its exemption, as in this case, may be revoked retroactively. Under the validation provisions of section 7428(c) and the Commissioner's exercise of discretionary authority under section 7805(b), however, deductions may be allowed for contributions made to a listed organization until its name is removed from the Cumulative List even though the organization itself is taxable. See Rev. Proc. 82-39, 1982-2 C.B. 759. The Cumulative List serves mainly as a guide for taxpayers in determining *353 whether donations to particular organizations will be deductible. Good faith requires the IRS to honor a listing for the benefit of donors until it is deleted from the list. The right of an organization itself to tax exemption, however, depends on its continued operation exclusively for charitable purpose and otherwise complying with section 501(c)(3), not the appearance of its name on the Cumulative List. Petitioner had ceased to be a section 501(c)(3) organization at least as early as September 1, 1977, the beginning or the period in controversy, and it does not here contend otherwise. Indeed, petitioner's position throughout the trial of this proceeding that practically every activity in which it was engaged was a trade or business carried on for profit is precisely contrary to its claim to section 501(c)(3) exempt status. The character of Synanon's receipts in the form of donations in its hands is thus to be determined by the law applicable to an organization engaged in a trade or business and not the law applicable to exempt organizations. See Birmingham Business College, Inc. v. Commissioner,276 F.2d 476, 481-482 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; *354 Stevens Bros. Foundation, Inc. v. Commissioner,324 F.2d 633, 640-642 (8th Cir. 1963), affg. 39 T.C. 93 (1962). 4. Value of the Food and Clothing Petitioner maintained records for its department known as "The Synanon Distribution Network" on which it recorded the goods, when received, measured in units (quantity). As discussed above, petitioner redistributed substantial quantities of the contributed goods to charitable organizations and assigned an estimated retail value to those distributions. Petitioners did not, however, place a value on the food and clothing consumed by the residents in the Synanon community. Faced with the absence of reliable records showing the value of the consumed food and clothing, respondent calculated the expenditures Synanon would have been required to incur in providing food and clothing for the Synanon residents by reference to statistics of the Bureau of Labor Statistics. The estimated total expenditure for food and clothing was computed by utilizing the statistics for a low standard of living for Bakersfield, California, for the years 1977 and 1978, and a low standard of living for San Diego, California, for the years 1979 through 1983. These *355 figures were then multiplied by petitioner's average yearly number of residents for each year as determined from petitioner's records. From the product, respondent subtracted Synanon's actual expenditures for food and clothing as recorded on its books. The resulting difference was then included in income for each year. Citing Weimerskirch v. Commissioner,596 F.2d 358, 362 (9th Cir. 1979), revg. 67 T.C. 672 (1977), petitioner argues that respondent has failed to carry his burden of coming forward with substantive evidence to sustain his position. Petitioner's argument disregards the stipulation that food and clothing were actually received, Synanon's own records on some of the items received, and the reams of testimony from several witnesses on the activities of the Adgap salesmen and other Synanon representatives. When the trial record shows the actual receipt of an item such as cash, food or clothing, the Weimerskirch rule does not relieve the taxpayer of the burden of proving the amount or the character of that receipt. Delaney v. Commissioner,743 F.2d 670, 671-672 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; Schad v. Commissioner,87 T.C. 609, 619 (1986), affd. *356 without published opinion 827 F.2d 774 (11th Cir. 1987). To sustain its burden of proof, petitioner offered no evidence of the value of the contributed food and clothing which it consumed. In the absence of any evidence from petitioner on this point, we find that, in the circumstances of this case, respondent's valuation method was a reasonable one. Pollard v. Commissioner,786 F.2d 1063, 1066 (11th Cir. 1986), affg. a Memorandum Opinion of this Court; Giddio v. Commissioner,54 T.C. 1530, 1533 (1970). We think, however, that respondent's figures should be modified. Petitioner has shown that many of the goods received were not of retail value. Some of the items were not salable because of mislabeling or defects in the manufacturing process. Some of the food had deteriorated and was not useable. Moreover, by purchasing food and clothing for the entire community, Synanon rarely paid retail prices. Further, some of the residents provided some of their own clothing. These factors lead us to conclude that respondent's calculations should be reduced to some extent. Taking into account the fact that the burden of proof rests with petitioner, we find that the amounts of the income attributable *357 to food and clothing determined by respondent under the formula described above should be reduced by 10 percent each year. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Petitioner argues that the expenses incurred in obtaining the donations should be applied to reduce the value of the contributed food and clothing. In the discussion which follows, however, we have dealt with the allowability of the expenses attributable to the Synanon Distribution Network and held that such expenses are allowable as deductions to the extent of the income attributable to this activity. Because the SDN expenses exceed the income from this source, we need not consider petitioner's argument on this point. We find that the value of the contributed food and clothing used by Synanon was $ 4,094,912, i.e., 90 percent of the value determined by respondent. 5. Whether Certain Activities were Trades or Businesses With respect to the 13 non-Adgap activities listed in our findings, it is stipulated, as noted above, that "expenses are allowed as a deduction in an amount equal to the revenues derived from those non-Adgap activities, and that no other expenses are attributable" to those activities. On brief, *358 petitioner concedes "for the purposes of this litigation, based on the reasoning in Love Box Co. v. Commissioner,842 F.2d 1213 (10th Cir. 1988), petition for cert. filed, 56 U.S. Law Week 2569 (U.S. May 21, 1988) (No. 85, 1804), all expenses associated with the rehabilitation of character-disordered persons with less than three years' residency could be viewed not to be deductible as business expenses under section 162." This activity is referred to by the parties as Education/Rehabilitation. Remaining in dispute are the following activities: (a) Synanon Distribution Network, (b) Lifestyler Operations, (c) Education/School, and (d) Corporate Investment and Realty. In broad terms, respondent takes the position that these four disputed activities were not section 162(a) trades or businesses because, he argues, the activities were not carried on with the objective of making a profit. Instead, he argues that these activities were related to the furtherance of the communal lifestyle of the Synanon community and that none of the related expenses may be deducted. Petitioner maintains that it had a profit objective for each of the four activities and that each was, therefore, a section 162(a) *359 trade or business. The basic principle of examining each activity to ascertain whether its objective was to make a profit has been repeatedly sanctioned by the courts. In numerous cases, the courts have held that the expenses (in excess of income) incurred in activities of a corporation which are not carried on for profit are not deductible. International Trading Co. v. Commissioner,275 F.2d 578, 585 (7th Cir. 1960), affg. a Memorandum Opinion of this Court (resort property maintained for the families of shareholders); Transport Manufacturing & Equipment Co. v. Commissioner,434 F.2d 373, 377 (8th Cir. 1970), affg. a Memorandum Opinion of this Court (mansion occupied by shareholder's wife and daughter); Mel Dar Corp. v. Commissioner,309 F.2d 525, 534 (9th Cir. 1962), affg. a Memorandum Opinion of this Court (property purchased for accommodation of shareholder's daughter); American Properties, Inc. v. Commissioner,28 T.C. 1100, 1114 (1957), affd. 262 F.2d 150 (9th Cir. 1958) (maintaining racing boats for the benefit of the shareholder). In all of these cases, the courts distinguished between profit and nonprofit motivated activities of business corporations and concluded that *360 a nonprofit motivated activity, even if operated by a profit-making concern, does not constitute a trade or business for purposes of section 162(a). Deductions were allowed only to the extent of the related income. All of the foregoing cases involved stock corporations. Contrary to petitioner's argument, we think that each of petitioner's activities as a membership corporation must similarly be examined to determine whether the objective of the activity was to make a profit. Thus, in Adirondack League Club v. Commissioner,55 T.C. 796 (1971), affd. 458 F.2d 506 (2d Cir. 1972), a membership corporation exempt as a social club was not permitted to offset losses from its exempt recreational activities against profits from timber cutting operations because the recreational expenses did not arise from the carrying on of a for-profit trade or business. Similarly, in Five Lakes Outing Club v. United States,468 F.2d 443 (8th Cir. 1972), the court held that a corporation exempt as a social club could not merge its profitable activities with its exempt activities by simply putting them under the same corporate roof. See also Iowa State University of Science & Tech. v. United States,500 F.2d 508, 522 (Ct. Cl. 1974). *361 Even if any one of these four disputed activities was not a section 162(a) business, petitioner is entitled to deductions for expenses incurred in carrying on the activity in amounts not to exceed income attributable to the activity. In respondent's opening statement, the following colloquy occurred which, as we understand it, was a concession to that effect: THE COURT: Well, let me, before you sit down, let me ask you -- MR. CIRANNI: All right. THE COURT: -- as I understand it, we have an organization here which is engaged in numerous activities. MR. CIRANNI: That's correct, your Honor. * * * THE COURT: If the activity is not carried on for business purposes, for the making of a profit, then in that event, the income which is derived by that business, that is received by that business, is taxable subject to deductions which are particulary [sic] allocable to that business. MR. CIRANNI: That's correct. THE COURT: In other words, the amount of the income derived from a non-business activity, is taxable, but the taxpayer is entitled to reduce that income by the expenses incurred in producing the non-business income. MR. CIRANNI: That's right, but he can't reduce it to less than zero. *362 * * * Notwithstanding this apparent concession, respondent on brief argues that the expenses of these disputed activities were not paid or incurred in carrying on a section 162(a) trade or business and are not, therefore, deductible to any extent. Respondent's position on this issue is inconsistent not only with the concession in the opening statement but also with the administrative practice of the Commissioner "not to inquire whether a profit motive exists unless claimed deductions exceed gross income. * * * the lack of a profit motive will cause disallowance of only the difference between the amount of the deductions and the gross income from the activity." Brannen v. Commissioner,78 T.C. 471, 521 (1982), affd. 722 F.2d 695 (11th Cir. 1984) (Judge Whitaker, dissenting). This practice is designed to avoid the taxation of gross receipts. See Commissioner v. Tellier,383 U.S. 687, 691-692 (1966). Thus, referring to the cases cited above, in American Properties, Inc. v. Commissioner,28 T.C. 1100 (1957), affd. 262 F.2d 150 (9th Cir. 1958), only the expenses of the racing boats over the income from the boats were denied as deductions. In International Trading Co. v. Commissioner,275 F.2d 578, 587 (7th Cir. 1960), *363 affg. a Memorandum Opinion of this Court, only the excess of expenses over rent received from the shareholders was disallowed. Again, in Mel Dar Corp. v. Commissioner,309 F.2d 525 (9th Cir. 1962), and Transport Manufacturing & Equipment Co. v. Commissioner,434 F.2d 373 (8th Cir. 1970), only actual losses were denied deduction -- expenses which were offset by income were allowed full deduction under section 162. See sec. 1.162-12, Income Tax Regs. The principle has been codified for individuals in section 183(b)(2). Similarly, section 277, quoted above, allows social clubs and other membership organizations operated primarily to furnish goods and services to members -- usually a nonprofit activity -- deductions for expenses attributable to the furnishing of those services to the extent of the income derived from that source. The allowance of a deduction for nonbusiness expenses to the extent that they generate income is thus a firmly established principle of the tax law. Even if one or more of these activities were not a section 162(a) trade or business, petitioner is entitled to a deduction for its expenses in an amount not exceeding the income generated by that activity. (a) *364 The Synanon Distribution Newtwork
Through its Synanon Distribution Network (SDN), petitioner, as discussed above, aggressively sought and obtained donations of surplus food and clothing from manufacturers, wholesalers and other sources. In carrying on this activity, it incurred expenses in the stipulated amount of $ 4,549,902. Much of the food and clothing was consumed by Synanon residents; the remainder of the donations was passed along to section 501(c)(3) tax-exempt organizations. Respondent takes the position that none of the expenses incurred in this activity is deductible because it was not a trade or business. Petitioner has argued, and we have rejected the argument, that the goods it obtained and used for its own purposes were gifts, not taxable income. Petitioner could hardly contend that it was in the business of soliciting gifts and, as we understand its briefs, does not so contend that this phase of SDN was a business. The parties agree that the value of the goods that petitioner passed along to section 501(c)(3) organizations was not includable in petitioner's gross income. But petitioner argues that it developed a trade or business of soliciting and distributing *365 goods to charities for which it charged fees, that this phase of SDN was a trade or business, and that its expenses are, therefore, deductible. There is testimony that Synanon's objective was to make a profit from charging section 501(c)(3) organizations fees for services in making the goods available to them, but we do not find that testimony convincing. That testimony is directly contrary to the representations in the Synanon catalogs that SDN was a nonprofit activity. Moreover, in an affidavit by Macyl A. Burke, who supervised SDN, filed in the tax exemption declaratory judgment proceeding, Burke stated that "in the fall of 1980 the Synanon Distribution Network began charging nominal handling fees to recover part of its administrative expenses." In fact, the regulations under section 170(e)(3), which was used to induce contributions, provide that a donation will not qualify as a deduction if the transferee receives money, property or services for the transfer of the property; an exception is made if the donee organization charges a fee, small in relation to the value of the property, "designed to reimburse the donee organization for its administrative, warehousing, or other similar *366 costs." Sec. 1.170A-4A(b)(3)(ii), Income Tax Regs. Recovering only costs hardly represents a profit objective. We hold that SDN was not a trade or business. Petitioner is entitled to deductions for expenses not in excess of $ 4,094,912, the amount which we have found to be includable in petitioner's income from its SDN activity. (b) Lifestyler Operations
Petitioner provided room, board and services to persons who were not employed by petitioner but who lived on property owned by petitioner. These persons were called Lifestylers and they paid money to Synanon for the services they received. From this source, Synanon received total revenue of $ 1,152,638 for the seven years in controversy. In return for this revenue, Synanon incurred expenses for medical care, meals, use of vehicles and the like. Testimony offered by petitioner shows that the expenses in this respect amounted to a total of $ 376,089 The parties have debated at length the issue as to whether the Lifestyler activity was a section 162(a) trade or business. In the light of all the evidence, we have concluded that, even though Synanon's revenues exceeded its expenses from its Lifestyler operations, the activity was *367 primarily a recruiting device rather than a trade or business. A number of Synanon residents, including Lawrence Akey, Controller of Synanon, for example, began their relationship with Synanon as Lifestylers. The record does not establish that Synanon attempted to attract Lifestylers as part of a business but that it used the Lifestyler activity as a means of attracting residents with philosophies similar to those espoused by Synanon. However, this activity produced income, and the claimed deductions are less than the stipulated income from this source. For the reasons stated in the foregoing discussion of the Synanon Distribution Network issue, petitioner is entitled to the Lifestyler deductions totaling $ 376,089. (c) Education/School
Petitioner maintained an educational program which provided services for children from nursery age through high school age. The facility was a boarding school which provided housing, meals, laundry, recreation, health care, and basic child care. The school was licensed by the state, kept good records, administered standardized tests, and used innovative educational methods. Petitioner received grant moneys from government and private sources. *368 Some Lifestylers paid to educate their children in the school. Payments were made by some parents not residing in Synanon for their children who were enrolled in the school. As we view the evidence, the school was not a trade or business but was operated primarily for the benefit of residents with children of school age. The record does not show that petitioner is entitled to any deductions for the operation of the school in excess of the amount of income from it. The parties may identify such income and expenses in connection with the Rule 155 computation. (d) Corporate Investment and Realty
During the years in issue, as detailed in our findings, petitioners sold several pieces of real property that it had purchased, improved and, in some instances, used for community or business purposes. It is stipulated that petitioner realized net capital gains of $ 6,662,680 from this source. In addition, petitioner received gross rents in each of the years before the Court, in a total sum of $ 891,293. Petitioner invested some of its gains from these and other sources in certificates of deposits, stocks, treasury bills and other instruments from which during the tax years it received total *369 interest income of $ 1,973,322 and dividend income of $ 420,379. To manage its portfolio of investments, petitioner set up and maintained an investment office which also incidentally provided investment advice to some of the Synanon residents. Petitioner contends that this entire activity was a trade or business and, as to the real estate activity, states that it sold "these properties to customers in the ordinary course of business with the intent to make a profit." But petitioner cannot have it both ways. If these properties were sold in the ordinary course of a business, the gain would be taxable as ordinary income rather than as capital gain. E.g., Graves v. Commissioner,867 F.2d 199 (4th Cir. 1989), affg. a Memorandum Opinion of this Court; H-H Ranch, Inc. v. Commissioner,357 F.2d 885, 887 (7th Cir. 1966), affg. a Memorandum Opinion of this Court. Yet the parties have stipulated that the gain was capital in nature. In view of the stipulation and the absence of convincing evidence to the contrary, we hold that the real estate portion of this activity was not a section 162(a) trade or business. As to some of the properties, petitioner argues that they were used in the land *370 and livestock (or agricultural) activity which, it is stipulated, was a trade or business and, therefore, section 1231 makes the gain capital in nature. Similarly, if any of the properties that were sold were used in the rental business at the time of the sale, section 1231 would apply. But the applicability of section 1231 to any such properties does not aid petitioner's trade or business argument with respect to its realty activity. The parties have stipulated to the adjusted basis of the several properties that were sold. The stipulated basis includes not only the cost of each property but also the cost of the improvements made to it. To allow deductions for the cost of making the improvements in addition to the basis adjustments for such improvements, as petitioner seems to argue, would be duplicative. As to the properties that were rented and produced the rental income of $ 891,293, petitioner is, of course, entitled to the allowable related deductions. The deductions for taxes, interest and depreciation are discussed infra, but we have been unable to quantify any other rental expenses. As to the costs of operating the investment office, we think the ordinary and necessary *371 expenses are deductible. In arriving at the deductible amount of "other salaries and wages" as well as in-kind compensation, we have included the expenses of that office in the allowable amounts. 6. Deductibility as Compensation of Executive Compensation and Other Salaries and Wages (a) Cash Executive Compensation
Petitioner claims deductions totaling $ 3,645,504 for cash executive compensation paid to its officers and directors during the taxable years in question. Respondent has allowed petitioner a deduction for $ 548,987, thus leaving the deductibility of the remaining $ 3,096,517 in issue. There is no controversy as to whether petitioner paid the disputed amounts designated executive compensation. The parties have focused almost exclusively on whether the cash payments to petitioner's officers and directors were actually compensation or a distribution of Synanon's assets. Petitioner asserts the entire $ 3,096,517 in issue was bona fide executive compensation and is fully deductible. Respondent, on the other hand, disputes that any of the $ 3,096,517 was in fact compensation. He asserts the payments, while in the guise of salary or bonus, were in actuality part of a scheme *372 by Dederich and other Synanon insiders to distribute petitioner's assets. The burden of proof rests with petitioner. Welch v. Helvering,290 U.S. 111 (1933). A determination as to whether all or any portion of the $ 3,096,517 in issue was in fact compensation, does not end our inquiry. For petitioner to receive a deduction, the compensation paid must also be an expense of its carrying on a trade or business. Section 162(a)(1). Amounts paid in the form of compensation, but which are not in fact paid as the purchase price for services, are not deductible. Section 1.162-7(b)(1), Income Tax Regs. Where an expense is incurred partly for the conduct of business and partly for the conduct of nonbusiness activities, an allocation must be made. 1. Nature of the payments as compensation. Petitioner was organized and ostensibly operated as a nonprofit corporation under California law. In actuality, as we have noted, the parties have stipulated that petitioner carried on 14 for-profit business activities during the years before the Court. From all the evidence, the officers and executives, rather than serving as fiduciaries for a charitable entity, acted as if they were the proprietary *373 owners of Synanon. The record is also clear that, since petitioner's incorporation in 1958, Dederich has dominated and controlled Synanon's Board of Directors. He served as chairman of Synanon's board from 1958 through January 29, 1978, and then was succeeded by his daughter. Under petitioner's amended 1975 bylaws, the only members of Synanon are its directors. The bylaws make the chairman's term indefinite; he can be removed only by a two-thirds vote of the board. All other directors serve a one-year term or until the chairman declares their office vacant. Also, regular directors' meetings did not have to be held because the bylaws authorized the board to delegate its powers to an executive committee. Moreover, even following Dederich's resignation as chairman, he continued to be a director and remained the acknowledged "spiritual leader and highest spiritual authority." Thus, special scrutiny of salary arrangements is warranted because Dederich and his close associates who were in control of Synanon set their own compensation. If purported compensation represents a diversion of Synanon's profits by these officers and directors, as respondent contends, it is not deductible. *374 Charles Schneider & Co. v. Commissioner,500 F.2d 148 (8th Cir. 1974), affg. a Memorandum Opinion of this Court; Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1156 (1980). Petitioner points to several factors supporting its contention. Prior to 1976, the cash compensation paid to officers and directors was nominal, and petitioner contends that the distributions in controversy were, in part, compensation for past services. Compensation paid for past services may qualify as current deductions if reasonable in amount and, in fact, paid for that purpose. Lucas v. Ox Fibre Brush Co.,281 U.S. 115 (1930). Moreover, during the years in issue, the executives, 13 to 19 in number, rendered significant services to petitioner. Also, the amounts received by at least some of these executives, other than Dederich, his family and long-time associates, are not extremely large even taking into account the in-kind benefits they received. Respondent, further, has stipulated that to the extent the amounts paid are found to actually be compensation, such compensation would be reasonable in amount. Nevertheless, we are convinced that most of the disputed amounts paid Dederich and certainly *375 a portion of the salaries paid his family and close associates were not in fact compensation. The record includes transcripts of directors' meetings of which Dederich and other directors calmly discussed plans to have a for-profit corporation, established by them, buy up all of Synanon's assets. While Synanon's assets would be acquired in seemingly arm's-length transactions by this corporation for fair consideration, the assets would be diverted in the form of salary payments. The transcripts reflect that these individuals viewed the salaries they arranged to pay themselves as "cutting up the swag." At an October 20, 1977 board meeting, Dederich's lifetime employment agreement was amended to raise his annual salary from $ 75,000 to $ 100,000, notwithstanding the $ 500,000 pre-retirement "bonus" also paid him. Petitioner points out that these transcripts were introduced in evidence by a stipulation that the transcripts, along with other items, were "offered by respondent for the limited purpose of showing, to the extent that the materials reflect, that nonbusiness topics were discussed at the [Board of Directors and other] sessions and that facilities were used for nonbusiness uses." *376 Petitioner objects to the use of the transcripts as substantive evidence of what was actually discussed at the meetings. As a minimum, we think the transcripts, introduced by this ambiguous stipulation, may be accepted as evidence that the directors did not, at all times, devote their full time and attention to the advancement of Synanon's best interests. Petitioner also complains that the tape transcripts offered by respondent are incomplete, represent only the conversations of not more than a handful of its directors' meetings and do not specifically establish an actual diversion of petitioner's assets. But petitioner is hardly in a position to complain about the incompleteness of the evidence. In its tax exemption declaratory judgment action, petitioner was judicially determined to be estopped from denying it had engaged in a "willful, deliberate and purposeful scheme to destroy * * * extensive amounts of evidence and discoverable materials which probably would have had a dispositive bearing upon * * * [its] non-profit status." Synanon Church v. United States,579 F. Supp. 967, 972 (D. D.C. 1984). In the declaratory judgment action and in the earlier case, Synanon Foundation, Inc. v. Bernstein,503 A.2d 1254 (D.C. App. 1986), *377 affg. No. 7189-78 (D.C. Superior Ct., filed October 12, 1983), petitioner's tax-exempt status and, specifically, whether there had been private inurement, was in issue. The United States Court of Appeals for the District of Columbia, affirming the District Court's dismissal of petitioner's declaratory judgment action based on petitioner's fraud upon the court, observed that willful destruction of evidence properly raises the inference the materials destroyed were adverse to the party bringing about the destruction. Synanon Church v. United States,820 F.2d 421, 428 n.18 (D.C. Cir. 1987). The evidence on this issue is most unsatisfactory in many respects. The burden of proof rests with petitioner. Petitioner has offered no credible explanation why Dederich's cash salary under the lifetime employment agreement was increased from $ 75,000 to $ 100,000 a year. Petitioner is also silent as to the discrepancy between Dederich's yearly salary and the amounts which Synanon's controller swore in an affidavit were paid. See n.3, supra. Yet, on the basis of the entire record we conclude that substantial portions of the amounts paid represented actual compensation. Using our best judgment, *378 and bearing heavily against petitioner because this inexactitude is of its own making, we find the $ 500,000 bonus paid to Dederich for fiscal year 1977 was not actually compensation. It represented simply a distribution of petitioner's assets to Dederich. We also find an additional 10 percent of the amounts of cash paid to the executives in each fiscal year was not actually compensation. No deductions are allowable for the disputed amounts that are not compensation. 2. Allocation. We must now determine what portion of the actual compensation to the executives is allocable to those Synanon business activities for which petitioner may receive a deduction. No deduction, of course, is allowable for executive compensation attributable to the five activities which were not carried on as trades or businesses. As to the 13 activities other than Adgap which the parties agree are trades or business, petitioner and respondent have stipulated that expenses are allowed as a deduction in an amount equal to the revenues from these non-Adgap activities, and that no other expenses are attributable to such activities. We are left with the compensation attributable to Adgap. Petitioner's controller, *379 Brooks Carder, offered the opinion that 56 percent or more of each fiscal year's total executive compensation was allocable to Adgap. Taking into account his description of the duties of each executive, Carder estimated the portion of that executive's yearly compensation attributable to Adgap. We reject the 56-percent allocation figure put forward by Carder. We do not find Carder's testimony convincing. Carder did not explain why Synanon earlier on its Forms 990-T for fiscal years 1981, 1982 and 1983, allocated only 25 percent of executive compensation for each fiscal year to Adgap. In fact, we find that the 25 percent used on the 990-T's is the best indicator of the portion of executive compensation expense allocable to these activities for which petitioner may receive a deduction during all the taxable years in issue, not just for 1981, 1982 and 1983. Carder's opinion and estimates were obviously prepared long after the fact and expressly for purposes of this litigation. In conclusion, of the $ 3,645,504 paid to Synanon executives during the fiscal years 1977 through 1983, we find petitioner is entitled to the following deductions for compensation under section 162(a): FYE
Deductible Amount
8/31/77
$  70,934
8/31/78
95,873
8/31/79
69,397
8/31/80
70,531
8/31/81
184,000
8/31/82
92,000
8/31/83
170,000
These *380 deductible amounts include the amounts previously allowed by respondent. We have allowed deductions for approximately 25 percent of the amounts we determined petitioner actually paid as compensation. (b) Other Salaries and Wages
Petitioner paid what it describes as "Other Salaries and Wages" or nonexecutive cash compensation to Synanon residents in the total amount of $ 8,501,509 during the seven years before the Court. Of this total payment, respondent has allowed deductions for Other Salaries and Wages in the amount of $ 1,465,338, the total amount which was recorded on the Adgap ledger. Petitioner has conceded that a total of $ 51,823 paid to employees of its Rehabilitation or Newcomer Department is not deductible. In dispute are the remaining nonexecutive salaries and wages in the total amount of $ 6,984,348 which were not recorded in the Adgap ledger but in the miscellaneous ledgers. Excluded from the general category of persons receiving salaries or wages are character-disordered persons who had lived in Synanon less than three years, school children, retired individuals, residents who did not work for petitioner, dependents, and individuals receiving executive compensation. *381 Some of these individuals received allowances referred to as WAM or Walk Around Money, and petitioner has conceded that the payments to these individuals are not deductible. The payments in dispute are amounts paid to individuals employed by petitioner during the years before the Court. The average number so employed, according to the stipulation, ranged from 636.2 in 1977 to 420 in 1983. We interpret these average numbers to include the executive employees, 13 to 19 in number. The individuals receiving salaries and wages were employed in the wide variety of activities carried on by Synanon. Attempting to resolve the amount of other salaries and wages attributable to the business rather than the nonbusiness activities is difficult in the light of the record before us. Petitioner's accounting records were not maintained separately for each of the several activities. A separate ledger was maintained for Adgap in which most, but not all, expenses were recorded. The records on the income and expenses of the other activities were reflected in books which we have called general ledgers. But the accounts in these general ledgers were not, as a general rule, keyed to the several separate *382 activities. Instead, the expenses were recorded in 41 separate accounts for each of the administrative departments, listed in our findings, covering such items as food service, general office expenses, purchasing transportation, and the like. Respondent contends that none of the cash payments to residents are deductible as wages or salaries. To support this position, respondent points to statements made by petitioner to the Internal Revenue Service when it enjoyed tax exemption and was seeking to avoid section 511 (unrelated business income) taxation of its Adgap earnings. In these statements, petitioner asserted that "the entire rehabilitation and training program of Synanon Adgap is operated by individuals serving without compensation" and that therefore the unrelated business income tax did not apply to Adgap income, citing section 513(a)(1). Petitioner seeks to have us dismiss these factual assertions as "merely a statement of Petitioner's legal argument at the time that all its revenues should be viewed as related to exempt purposes." Respondent also argues that the cash payments were not compensation for services but were something in the nature of allowances. Respondent *383 cites the testimony of a former resident that, as members of the community, "we all worked to support that community and we would all be taken care of." That witness testified that the so-called salaries were based on "morality and honesty and character and loyalty and proprietorship." According to another witness, residents of Synanon were told upon entering a community that "if you don't withhold anything, Synanon will not withhold anything from you. You will be taken care of." Respondent argues that this testimony shows that the disputed payments were not made to the residents as compensation for services actually rendered. See sec. 1.162-7, Income Tax Regs. Petitioner responds that the cited testimony came from individuals with limited knowledge of Synanon's Adgap operations and argues that, viewed as a whole, the testimony and the stipulation show that the cash payments were made to employees who actually performed services for Synanon. To be deductible the salaries and wages must be paid or incurred in carrying on a trade or business within the meaning of section 162(a). In light of the massive record as a whole, we are convinced that a part of the amounts claimed as deductions *384 for salaries and wages were paid for services actually rendered to trades or businesses, principally Adgap, even though some of the compensation was not recorded in the Adgap ledger. These services included such work as soliciting and processing Adgap orders and invoices, maintaining books and records on the Adgap operation, operating the switchboard for incoming and outgoing sales calls, and a variety of other supporting duties. In addition, as stated above, we think the wages and salaries paid for services in Synanon's rental activity and investment office for management of its portfolio of investments are allowable. We have no reliable evidence of the precise amount that is allowable as deductions for these services. We must, therefore, base our finding on an estimate reflecting our best judgment in the light of the record as a whole. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). The testimony is conflicting as to the number of employees who performed services for Adgap. One witness, a former resident of Synanon, testified that only 10 to 15 percent of the residents performed services for Adgap. Another former resident testified that 15 percent of the adult population *385 engaged in Adgap activities. In an affidavit by Macyl A. Burke, a board member and Chief Executive Officer who supervised Adgap beginning in May 1981, he stated that "Synanon's advertising gifts and premiums business is operated in a competitive market by Synanon residents who have never received direct compensation for their activities." In letters accompanying its Forms 990 for fiscal years 1977 and 1978, petitioner stated that "substantially all of the work in carrying on Synanon Adgap is performed for the organization without compensation" and that "the persons who participate in Synanon Adgap, other than in the capacity of trainee, also serve without compensation." Lawrence Akey, President of Synanon from August, 1979 through August, 1983, testified that "at times we've had a hundred people that have been directly involved in the sales part of that business and sometimes even more than that involved in the back office support operations for that business." Another witness, Brooks Carder, Controller of Synanon, estimated that "forty-eight percent of the personnel were involved in the Adgap activity," and he expressed the view that 48 percent of the wages and salaries were appropriately *386 allocable to Adgap. Only a limited number of employees worked in the rental and investment office. In weighing this testimony, we have been faced with petitioner's apparent inability to distinguish between truthful factual testimony and what, as noted above, petitioner characterizes on brief as "merely a statement of Petitioner's legal argument at the time * * *." [14] In the light of all the evidence which we deem credible, we find that approximately one-fourth of the employees of Synanon performed compensable services for Adgap, the real estate rental activity and the investment office. The following amounts of the line item for "Other Wages and Salaries" are deductible: 1977
1978
1979
1980
1981
1982
1983
$ 138,000
$ 177,000
$ 347,000
$ 408,000
$ 350,000
$ 301,000
$ 405,000 These figures include the Adgap personnel expenses of $ 1,465,338 already allowed for the seven years here in controversy. They include nothing for the 13 other activities stipulated to be businesses for which deductions were limited to income *387 and nothing for the five activities which were not carried on as trades or businesses. In arriving at the figures, we have taken into account the fact that the Adgap salesmen not only spent time on Adgap business but also solicited goods for the Synanon Distribution Network; in an affidavit given by Macyl A. Burke in connection with the tax exemption declaratory judgment action, he stated that "approximately 20% of the direct ADGAP marketing costs are allocated to the Synanon Distribution Network." In addition, we have taken into account the very substantial portion of the time of the Adgap supporting personnel that was devoted to the support of such nonbusiness activities as providing food service, housing, medical care, educational services, and other nonbusiness undertakings carried on for the operation of the self-contained communities. 7. In-Kind Compensation Petitioner seeks a deduction for the compensation paid in-kind to its resident employees. This compensation, according to petitioner, was paid to cover the cost of such items as housing, meals, transportation, education, child care, clothing and medical expense. The payments for these services, according to petitioners, *388 are reflected in the line items of expenses shown in the schedules appearing in our findings. Petitioner claims deductions for the cost of providing these services to all of the residents except character-disordered individuals and their dependents who had resided in Synanon for less than three years and employees working in the Newcomer Department (the Education/Rehabilitation activity) which was devoted to the re-education of character-disordered residents. We accept petitioner's argument that compensation for services by employees may take the form of an employer's provision of food, clothing, housing, medical care and the like. See Shiloh Youth Revival Centers v. Commissioner,88 T.C. 565 (1987); American Foundry v. Commissioner,59 T.C. 231, 243 (1972), affd. as to this issue 536 F.2d 289 (9th Cir. 1976); Wilhelm v. United States,257 F. Supp. 16 (D. Wyo. 1966). We think the evidence presented fairly supports a finding that Synanon's resident employees performed services and that, if they had not done so, they would not have been permitted to live in Synanon. In a practical sense, they performed services partially in exchange for the in-kind benefits they received at Synanon's *389 expense. Therefore, the services provided for the employees were in-kind compensation. Here, again, however, we must be mindful of the provisions of section 162(a) which allows a deduction for only ordinary and necessary expenses paid or incurred in "carrying on any trade or business" including a reasonable allowance for compensation for personal services actually rendered. It is not sufficient for petitioner to show that it provided food, clothing, medical care and other services to its employees. In addition, petitioner must show that Synanon paid the cost of those services in carrying on a trade or business. We have held in the foregoing discussion that the Corporate Realty and Investment, Lifestyler Operation, Education/School and Synanon Distribution Network activities were not trades or businesses and that cash compensation paid to employees assigned to those activities (with the exception of the rental activity and the investment office) was not, therefore, deductible. Similarly, in-kind compensation provided the employees of those activities would not be deductible. Further, as noted above, the parties have stipulated that 13 activities are trades or businesses and that "expenses *390 are allowed as a deduction in an amount equal to the revenues derived from those non-Adgap activities, and that no other expenses are attributable" to them. Thus, no in-kind compensation deduction may be separately allowed for the employees of these 13 activities. In essence, the same individuals who received allowable nonexecutive salaries and wages, plus the executive employees, we find, received deductible compensation in-kind, i.e., principally Adgap personnel and their support. In other words, approximately one-fourth of the total number of employees (ranging from an annual average of 636.2 to 420) received in-kind compensation for service in a trade or business. In determining the deductible portion of the total cost of in-kind benefits, the ratio of the number of trade or business employees so computed to the total number of residents which, as detailed in our findings, ranged from 1,301 at the end of fiscal year 1977 to 559 at the end of 1983, must then be determined. The resulting percentages of the residents who were trade or business employees provide a reasonable general standard for determining the approximate amount of deductible in-kind compensation. Petitioner argues *391 that the cost of providing support for dependents of employees should be allowed as in-kind compensation of the employees. We reject that argument. We have no evidence of the number of Adgap employees and employees supporting Adgap endeavors who had dependents and we have no rational basis for making an estimate. Moreover, the expense of providing for dependents is ordinarily a nondeductible section 262 personal or family expense and we find no reason to depart from the ordinarily applied rule. Petitioner would also have us include the Synanon executives among the individuals receiving in-kind compensation and we have done so. However, a very substantial part of the time of the executives was devoted to non-Adgap matters. As noted above, the Forms 990-T filed for fiscal years 1979 through 1983 allocate only 25 percent of the alleged cash compensation of executives to Adgap. Adgap resident employees as well as executives performing services for Adgap spent a considerable amount of time in travel status and respondent has conceded in his answer the deductibility of substantial amounts of Adgap travel expenses including food, lodging and other subsistence expenses. In the light *392 of all the credible evidence, we hold the following amounts are allowable as deductions for in-kind compensation under the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930): 1977
1978
1979
1980
1981
1982
1983
$ 265,000
$ 315,000
$ 305,000
$ 338,000
$ 325,000
$ 280,000
$ 270,000
As indicated in our findings, these amounts represent an allocation of Synanon's costs for insurance, utility and property expenses, medical, clothing and other resident expenses, meals, vehicles, and other general and administrative expenses. These figures do not include any deductions for taxes, interest and depreciation as such. Those items are dealt with separately infra. The figures take into account, however, the fact that the residential and other buildings used in providing community services for trade or business employees deteriorated with use even though a depreciation deduction as such is not allowable for them. The figures have also been adjusted for the fact that executive employees, according to the testimony, received especially favorable treatment in terms of in-kind benefits. In testing the reasonableness of our conclusions from the standpoint of the employees, we have taken into account Synanon's *393 position that the employees were not taxable on the in-kind compensation under section 119, which excludes from an employee's gross income the value of any meals and lodging furnished to him, his spouse or his dependents by his employer for the employer's convenience. 8. Depreciation At issue are the deductions which petitioner may receive for depreciation on its real property, machinery and equipment, and transportation equipment. Section 167(a) generally allows a deduction for depreciation on property used in the taxpayer's business or property held by it for the production of income. The section does not allow a deduction for property devoted to nonbusiness or nonincome-producing uses. Petitioner's depreciable real property falls into several categories. First, in computing gain or loss on the sale of the 20 pieces of real property sold during the seven years before the Court, depreciation in the amount allowed for the period before the sale was subtracted in computing petitioner's adjusted basis for each property. Because the parties have stipulated to the amount of the capital gain on each sale, we infer that there is no dispute as to the correctness of these adjustments. *394 We have been unable to determine from the record how much, if any, of the depreciation adjustments to the basis of the properties is attributable to the years before the Court. To the extent that the adjustments are attributable to depreciation allowed for the years before the Court, however, consistency requires the allowance of depreciation deductions in an equal amount to the depreciation adjustments for the several properties with the exception of the Texaco station. The parties are directed to allow the deductions, if any, to which petitioner is entitled in this respect in making their Rule 155 computations. The parties have stipulated that petitioner is entitled to deductions in an amount equal to the revenues derived from the Texaco station business. Accordingly, we need not determine whether petitioner qualifies for a deduction of depreciation incurred on the property used in that business prior to its sale. Remaining in dispute are depreciation deductions for three pieces of real property: two Tulare County, California, properties and the San Francisco Oyster Point property. The parties' stipulation with respect to those properties shows that they were used partially for *395 Adgap, partially for the activities which we have found were nonbusiness in character, and partially for the activities for which no further deductions are allowable. In these circumstances, we must make an allocation. See International Artists, Ltd. v. Commissioner,55 T.C. 94, 105 (1970) and cases cited. The record shows that the two Tulare County properties (referred to as the Home Place and Strip properties) and the Oyster Point property were used for a variety of purposes. On all three properties were living quarters and food service facilities. At Oyster Point, there were SDN and other facilities. At the Home Place and Strip were Adgap offices, departmental offices which provided support for both business and nonbusiness activities, as well as living quarters and food facilities. Upon examining all the evidence, we find that 33 percent of the Home Place and Strip properties and 25 percent of the Oyster Point property were used for Adgap or its supporting work. The depreciation deductions to be allowed for those properties will be computed accordingly. As to petitioner's equipment and machinery, no depreciation deduction as such is allowable for the equipment used in the *396 agriculture and livestock activity because the parties have stipulated the amount of the deductions to which petitioner is entitled for that activity. Some of the furniture and office, video and other equipment was used in support of Adgap and petitioner's rental and investment activities. We find petitioner should be allowed depreciation deductions of one-third of the amounts claimed. As to petitioner's transportation equipment, the record shows that some vehicles were used by Adgap sales personnel on business, but there is also evidence that much of the property was used by Synanon residents for nondeductible activities and for residents' personal purposes. Personnel in some of the departments used vehicles for personal purposes as well as in performing functions supportive of Adgap. Taking into account the whole record, and bearing heavily against petitioner because it has the burden of proof, we find 25 percent of the transportation depreciation expense is deductible. 9. Taxes and Interest Petitioner paid real and personal taxes and license and registration fees in the total amount of $ 719,631 and interest in the total amount of $ 1,432,301 during the seven years in issue. *397 The amounts paid annually are set forth in our findings. Respondent allowed the tax expenses in the amount of $ 48,496 and interest expenses of $ 10,093, the amounts shown in the Adgap books, leaving total taxes and fees of $ 671,135 and interest of $ 1,422,208 in dispute. In our view, the full amounts of the real and personal property taxes totaling $ 630,333 and interest totaling $ 1,432,301 paid by petitioner are allowable. Secs. 163(a), 164(a). The remaining $ 89,298 in dispute was paid by petitioner for other taxes, licenses and registrations. Petitioner has offered no evidence on what these taxes, licenses and registrations covered. Since petitioner previously claimed it was tax exempt, we conclude that very little, if any, of the $ 89,298 was paid for state or local income taxes. The record shows petitioner owned a number of vehicles. Vehicle license and registration fees may be deducted under section 164(a), if they are incurred in carrying on a trade or business or in the production of income. Sec. 164(a); sec. 1.164-1(a), Income Tax Regs. The evidence indicates that the vehicles were used to some extent in the Adgap business and in petitioner's rental and investment *398 activities. Using our best judgment in the light of the record before us, we find that petitioner is entitled to deduct 25 percent of the amounts paid for other taxes, licenses and registrations. 10. Miscellaneous Deductions Petitioner, during the seven years in issue, paid printing, postage and office expenses in the total amount of $ 1,381,360; expenses for minor consumables in the total amount of $ 345,396; air fares in the total amount of $ 1,017,474; and telephone expenses in the total amount of $ 3,360,761. The amounts paid annually are set forth in our findings. Respondent allowed printing, postage and office expenses in the amount of $ 717,396; air fares in the amount of $ 676,759; and telephone expenses in the amount of $ 2,352,075. He allowed no deductions for minor consumables. In dispute are $ 663,964 of printing, postage and office expense; $ 345,396 for minor consumables; $ 340,715 for air fares; and $ 1,008,686 of telephone expenses. The amounts in dispute were not listed in the Adgap books. However, we find that a portion of these miscellaneous expenses was incurred to support the carrying on of Adgap and petitioner's rental and investment activities. The printing, *399 postage and office expenses include dues and fees, office supplies, postage, printing, publications, office equipment maintenance and rental, and other expenditures. The minor consumables purchased include electronic equipment, office equipment and appliances and other expenditures. The airfares include Law Department travel, trips to petitioner's facilities in New York State and the eastern United States, and other expenditures. The telephone expenses include the expenses incurred at petitioner's facilities and other locations. Using our best judgment, and bearing heavily against petitioner because it bears the burden of proof, we find petitioner is entitled to deduct a further 25 percent of these miscellaneous expenditures, other than air fares, as expenses attributable to the conduct of its deductible activities. This 25 percent is in addition to the amounts previously allowed by respondent. As to the air fares, no further deduction may be allowed because petitioner has failed to meet the substantiation requirements of section 274(d). Dowell v. United States,522 F.2d 708 (5th Cir. 1975). 11. Professional Fees As detailed in our findings, petitioner paid large amounts of professional *400 fees during the taxable years in question and here claims deductions for portions of those amounts. The parties have stipulated the total professional fees paid, certain types of cases for which respondent concedes the fees are deductible, the fees petitioner concedes are nondeductible, and the fees the deductibility of which is disputed. [15] The parties have stipulated that the libel litigation expenses listed in the table set forth in our findings, supra, at p. 52, were reasonable in amount and were necessary in order to obtain libel judgments and that respondent has included the amounts of those judgments which petitioner obtained as income to Synanon. Respondent asserts that the libel cases expenses were membership expenses which under section 277 would *401 be deductible only against membership income. The parties, however, agree that, should the Court find section 277 inapplicable, the libel litigation expenses are deductible. Based on our previous holding that section 277 is inapplicable to petitioner for the taxable years in issue, we find the $ 971,493 of libel litigation expenses are deductible. Similarly, the parties stipulated that the property litigation expenses and the Adgap and collision litigation expenses listed in our findings are deductible. We accordingly find the $ 330,059 of property litigation expenses and the $ 153,739 of Adgap and collision litigation expenses are deductible by petitioner. This leaves in issue the deductibility of the remaining balance of $ 4,312,092 of professional fees. Petitioner has not been able to attribute $ 971,493 of the disputed fees to any particular cases, matters or expenditures. Petitioner bears the burden of proof. Rule 142(a). We refuse to speculate on whether the claims for which these legal expenses were incurred arose in connection with Synanon's business activities. There is no reasonable basis upon which we can make such an approximation. We find petitioner may not receive *402 a deduction for the $ 971,493 of fees. Our findings set forth the cases, matters and expenditures for which $ 3,340,599 of the disputed fees were incurred, along with a description of the nature of each individual lawsuit or expense. These disputed fees fall into the following 7 categories: (a) matters relating to former residents, [16] (b) matters relating to lifestylers, [17] (c) matters relating to children of residents, [18] (d) criminal cases or matters involving residents, [19] (e) civil matters relating to residents concerning acts allegedly done in the course and scope of their employment, [20] *403 (f) matters relating to tax litigation, [21] and (g) other general legal expenses. [22]
As a condition to deductibility of its litigation expenses, petitioner must show that the outlays were ordinary and necessary expenses incurred in carrying on a trade or business within the meaning of section 162(a). The parties recognize that the deductibility of the expenses under section 162(a) is governed by the principles enunciated in United States v. Gilmore,372 U.S. 39 (1963). Under Gilmore, legal expenses are deductible only if the claim arises in connection with the taxpayer's business activities. The fact that the litigation may have adverse consequences upon the taxpayer's business is irrelevant. In the words of the Supreme Court in Gilmore, (372 U.S. at 49) "the origin and character of the claim with respect to *404 which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test of whether the expense was 'business' or 'personal'" i.e., nonbusiness, within the meaning of section 162(a). See Jack's Maintenance Contractors, Inc. v. Commissioner,703 F.2d 154, 156-157 (5th Cir. 1983), affg. a Memorandum Opinion of this Court. In the present case, application of the Gilmore origin-of-the-claim test is crucial because Synanon, while a corporation, engaged in several activities, some of which were business and others of which were charitable or nonbusiness activities. Implicit in the Gilmore test is a further requirement that, for an expenditure to be deductible under section 162, it must be an ordinary and necessary expense, directly connected with or proximately resulting from the taxpayer's business. Kornhauser v. United States,276 U.S. 145 (1928). (a) Matters Relating to Former Residents
In Kohl, n.15, supra, a former resident sued petitioner alleging fraud, breach of contract, and alleged torts, regarding his previous employment and residency in Synanon. The evidence before the Court does not show the origin of the claim *405 that was the subject of the litigation, e.g., whether it arose from one of petitioner's business activities or from one of its nonbusiness activities. Because petitioner failed to show that the claim against it originated in one of its business undertakings, the expenses incurred in the litigation are not deductible. Rule 142(a). Petitioner, in contending that the fees expended are deductible, relies on Kopp's Co. v. United States,636 F.2d 59 (4th Cir. 1980), where a corporation was allowed to deduct the legal expenses incurred in defending itself and a shareholder's son in a tort suit stemming from an accident involving a company car driven by the son. The son had not been a corporate employee, nor had he been engaged in performing corporate business. In reversing the lower court's holding that the expenditure failed to meet the origin-of-the-claim test, the Fourth Circuit Court of Appeals distinguished Gilmore because the corporation had been named as a party defendant in the suit and was alleged to have negligently permitted the son to operate its car. We think Kopp's Co., supra, is inapposite to the present case. Unlike the instant case, the corporation in that case was a *406 business corporation engaged only in business activities. In contrast, petitioner during the taxable years in issue carried on substantial nonbusiness activities. The record does not show that Kohl's claim against petitioner originated from petitioner's business activities. In fact, the only employment referred to in the complaint is work as "personal servant for Charles Dederich." Thus, we think the mere naming of petitioner as a defendant in the Kohl lawsuit does not suffice to make the fees deductible. The Supreme Court in United States v. Gilmore,372 U.S. 39, 46-47 (1963), quoted with approval the following language in its earlier decision in Lykes v. United States,343 U.S. 118, 125 (1952): Legal expenses do not become deductible merely because they are paid for services which relieve a taxpayer of liability. That argument would carry us too far. It would mean that the expense of defending almost any claim would be deductible by a taxpayer on the ground that such defense was made to help him keep clear of liens whatever income-producing property he might have. For example, it suggests that the expense of defending an action based upon personal injuries caused by a taxpayer's *407 negligence while driving an automobile for pleasure should be deductible. * * *
It is not a ground for * * * [deduction] that the claim, if justified, will consume income-producing property of the defendant." In Lukjanczyk, the suit brought by the former resident was principally based on petitioner's alleged conversion of wood carvings made by the plaintiff. Petitioner has failed to show the suit arose from or was related to its business activities. Kornhauser v. United States,276 U.S. 145, 153 (1928). We hold the professional fees in Kohl and Lukjanczyk are not deductible. (b) Matters Relating to Lifestylers
The Ross, Tolchin, and Confidential Settlement (FYE 1982) (n.16, supra) lawsuits involved Lifestylers who sued Synanon for breach of contract and certain alleged torts. We have previously held petitioner's Lifestyler activity was not a trade or business. In fact, the breach of contract causes of action involved the plaintiffs' contractual rights under the Lifestyler arrangements each had entered into with petitioner to live in the Synanon community. In Ross, the complaint alleged that Ross paid over $ 52,000 to Synanon and that Synanon promised that he would have a home there *408 indefinitely and his son would receive a high school education; then, Synanon demanded that the son have a vasectomy. In Tolchin, the complaint alleged that, after payments were made pursuant to a contract, officials of Synanon demanded that Mrs. Tolchin have an abortion. Petitioner argues that the fees are nevertheless deductible because petitioner was named as a defendant in two of the cases and in all three matters the alleged tortious acts occurred on petitioner's property. Also, in two of the cases, petitioner notes that the alleged torts involved acts of residents claimed to have been done in the course and scope of their employment with petitioner. As discussed above, the mere naming of petitioner as a defendant in two of the suits does not make the legal expenses deductible. Kopp's Co. v. United States, supra, cited by petitioner, is distinguishable because petitioner engaged in substantial nonbusiness activities. Moreover, while the complaints in two of the suits alleged that employees of petitioner committed tortious acts, Synanon has failed to show that such claims arose from, or were proximately related to, any specific business activity rather than one of its nonbusiness *409 undertakings. Kornhauser v. United States,276 U.S. at 153. We find the fees in these matters concerning Lifestylers nondeductible under section 162. We find, however, that Synanon should receive in fiscal year 1983 a $ 1,600 deduction for the Tolchin litigation expenses. The parties stipulated petitioner received $ 1,600 in settlement or judgment income from the Tolchin case in 1983. Although the parties have also stipulated, petitioner similarly received $ 475,000 of judgment or settlement income from a matter labelled "Confidential Settlement," the record indicates that this was a different matter from the one involving a Lifestyler presented here. (c) Matters Relating to Residents' Children
All of the matters (n.17, supra) relating to residents' children involve guardianship or custodianship proceedings. On brief, petitioner argues that $ 2,792 of fees incurred in these proceedings should be deductible as a fringe benefit provided by Synanon as employer to its resident employees. An employer may furnish compensation by way of paying his employee's personal expenses. However, even viewing the fees as compensation paid to the parents of the children, it is clear that the compensation, *410 to be deductible under section 162, must be paid for services rendered in a trade or business. The record does not indicate whether these residents worked in a business activity carried on by petitioner. Thus, there is no basis upon which an approximate percentage of such compensation might be deductible. Petitioner has the burden of proof and we decline to speculate as to whether a portion of the fees might qualify as deductible compensation. We hold that petitioner may not deduct the fees in matters relating to employees' children. (d) Criminal Cases and Related Matters.[23] *411 The three criminal cases in which disputed fees were incurred are Arizona v. Dederich, People v. Benjamin and People v. Dederich (n.19, supra). The other case in this group, Superior Court/Tulare, was an action by Synanon for the return of items seized pursuant to a search warrant issued in a criminal investigation of the Morantz rattlesnake incident, described below, which was the subject of the criminal prosecution in People v. Dederich.
People v. Benjamin was a criminal prosecution for kidnapping. A former resident of Synanon was allegedly kidnapped and taken from Synanon's Marin County facilities to its San Francisco facilities. Arizona v. Dederich was a criminal case brought by the State of Arizona against Dederich for violation of Arizona securities statutes by illegally marketing securities. The securities were those of Home Place, Inc., a for-profit corporation which Dederich and others had established to conduct their own personal business ventures. Synanon did not own any interest in Home Place, Inc. People v. Dederich was a criminal prosecution for attempted murder. Two Synanon residents, allegedly at the behest of *412 Dederich, planted a rattlesnake in the mailbox of an attorney named Paul Morantz. Morantz had represented former residents in suits against Synanon. If section 162(a) is satisfied, the legal expenses of defending a criminal charge may qualify as a deduction, regardless of the outcome of the prosecution. Commissioner v. Tellier,383 U.S. 687, 689 (1966); O'Malley v. Commissioner,91 T.C. 352, 365-366 (1988). On the other hand, if the claim on which the prosecution is based does not arise out of petitioner's business activities, the legal expenses are not deductible. Jack's Maintenance Contractor's Inc. v. Commissioner,703 F.2d 154, 156-157 (5th Cir. 1983); Nadiak v. Commissioner,356 F.2d 911, 912 (2d Cir. 1966), affg. a Memorandum Opinion of this Court. The evidence does not show that the four cases in question had their origin in any trade or business carried on by petitioner. The expenses are not, therefore, deductible. Petitioner, arguing that the fees paid in these criminal matters are deductible, cites Parker v. Commissioner,365 F.2d 792, 801-802 (8th Cir. 1966), revg. on an arguably related point a Memorandum Opinion of this Court. In Parker, the founder and head of a *413 religious organization was prosecuted for contributing to the delinquency of a minor. Following his acquittal, he brought an action for slander. The religious organization paid the expenses of both the criminal and civil actions. This Court viewed the legal expenses as a personal expense of the founder, and held that their payment by the organization represented taxable income to the founder. In reversing, the Eighth Circuit Court of Appeals stated that, because the reputation and business of the organization was inextricably bound up with its founder, the payment of the expenses of the suits were of direct and substantial benefit to the organization. We find Parker v. Commissioner, supra, to be distinguishable and not helpful. The issue in Parker, presented to this Court and the Eighth Circuit, was whether the religious organization's payment of its founder's legal expenses constituted taxable income to the founder. No issue was raised as to the deductibility of the expenses by the organization or by the founder. It is true that the Eighth Circuit, in dicta, stated that the expenses would be deductible by the organization as an ordinary and necessary business expense. However, *414 the Eighth Circuit did not have that issue before it and did not address the Gilmore origin-of-the-claim test. At trial, petitioner offered considerable testimony of certain witnesses that these criminal actions adversely affected its business reputation. These witnesses stated that the unfavorable publicity, particularly from the rattlesnake incident, harmed Synanon's Adgap business reputation. Such considerations, however, are not controlling under the Gilmore test. The evidence offered by petitioner concerns only the attendant consequences of the litigation. See quotation from Lykes v. United States,343 U.S. at 123. Petitioner, in fact, offers little, if any, explanation of how the alleged criminal acts could have arisen from the pursuit of Synanon's business activities. Petitioner further argues that, as an employer of the individuals being prosecuted, it would have been legally obligated to indemnify their legal expenses. In our view, this is not so. The mere fact that these individuals were employees does not make the expenditures automatically an obligation of Synanon or deductible by it. As noted earlier, petitioner carried on substantial nonbusiness activities; thus, *415 it is crucial that Synanon satisfy the section 162(a) origin-of-the-claim test. Petitioner does not explain how these alleged criminal acts arguably occurred within the course and scope of these individuals' employment in one of petitioner's business activities. Petitioner has not established that the suits arose in connection with or proximately resulted from a business activity. United States v. Gilmore, supra;Kornhauser v. United States, supra. We find the professional fees paid by petitioner in these criminal matters are nondeductible. (e) Civil Matters Relating to Residents Concerning Acts Allegedly Done in the Course and Scope of Their Employment
In these civil matters (n.19, supra), petitioner was named as a defendant and the complaints alleged acts performed by residents in the course and scope of their employment. Some of these matters arose from the same incidents as were the subject of the criminal cases discussed above. In State of California, petitioner as plaintiff sought to enjoin the California State Attorney General from imposing a receivership or otherwise controlling Synanon's assets. The Attorney General's actions were based on allegations in the Arizona v. *416 Dederich case that Dederich and other Synanon insiders were looting petitioner's assets. The Morantz, Morantz/State of California, and Morantz Publication proceedings were related to the rattlesnake incident or involved suits by former residents represented by Morantz. The Marino & Smith, Gambonini, Eidson, Mulrooney and Confidential Settlement (Excluding FYE 1982) cases involved claims that Synanon residents had committed torts upon the plaintiffs. The plaintiff in Gambonini was a neighbor of Synanon who had been involved in a trespass dispute with petitioner and alleged harassment by residents. The other three matters involved persons who came upon or near petitioner's premises and claimed they were beaten or otherwise mistreated. As discussed earlier above, the mere naming of petitioner as a defendant or the mere fact that the other defendants may have been employees, does not automatically make the legal expenses deductible. As discussed above, Kopp's Co. v. United States, supra, and Parker v. Commissioner, supra, are distinguishable because here petitioner engaged in substantial nonbusiness activities. Petitioner must satisfy the origin-of-the-claim test in order to deduct *417 the legal expenses. Under the origin-of-the claim test the fact that publicity from some of these actions may have unfavorable consequences is not controlling. Petitioner on this record has failed to show that the claims in these civil matters arose in connection with or were proximately related to a business activity of Synanon. We find these legal expenses in these civil matters nondeductible under section 162 by petitioner. We, however, find petitioner should receive a $ 987 deduction for fiscal year 1981 for the Gambonini litigation expenses. The parties stipulated petitioner received $ 987 of settlement or judgment income in 1981 from the Gambonini case. While the parties have also stipulated, as noted above, that Synanon had $ 475,000 of settlement or judgment income from a matter labelled "Confidential Settlement," petitioner has not established such income was received in the matter presented here in which petitioner was named as a defendant in a civil case. (f) Matters Relating to Tax Litigation
These matters (n.20) include three separate tax disputes. The first was a suit commenced in this Court over petitioner's Federal Insurance Contributions Act (FICA), i.e., social *418 security tax liability, which was dismissed for lack of jurisdiction. The second was the declaratory judgment action referred to above which petitioner brought in United States District Court and, ultimately, to the United States Court of Appeals for the District of Columbia to contest the revocation of its tax-exempt status by respondent. The last matter was an excise tax dispute. The legal expenses incurred in connection with a tax determination are deductible as ordinary and necessary business expenses under section 162(a). [24] *419 Commissioner v. Shapiro,278 F.2d 556, 560 (7th Cir. 1960); Tracy v. United States,284 F.2d 379, 381 (Ct.Cl. 1960). We find the fees for these tax litigation matters deductible. (g) Other Legal Expenses
The expenses (n.21, supra) here are basically those of Synanon's in-house Law Department. Other than for the McCready Estate matter, it is not known in what cases or matters these expenses were incurred. In fact, petitioner in its records did not break out these expenses by case. It also failed to allocate its office and publication expenses to particular cases. The publication expenses were for legal journals and legal newspapers. The office expenses covered maintenance and other expenses related to copying machines and other office equipment. It is incumbent on petitioner to show that the expenses were incurred in suits or disputes where the claim arose in connection with and was related to a business activity. United States v. Gilmore, supra, and Kornhauser v. United States, supra. While petitioner *420 has not attributed these expenses to specific cases, a portion of such expenses, we find, was incurred in types of cases for which the legal expenses may be deducted. These include the property and Adgap cases, the direct legal expenses of which the parties here stipulated and agreed are deductible. Bearing heavily against petitioner because this inexactitude is of its own making, we estimate and find 30 percent of the other legal expenses (excluding the McCready Estate expense) or $ 41,136 is allowable as a deduction to petitioner. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1980). As to the $ 557 McCready Estate expense, the expenditure was made to collect a sizeable bequest left to Synanon. Ordinarily, the expense incurred to produce tax-exempt income may not be deducted under section 265. Section 1.265-1, Income Tax Regs. We have previously held, however, that the gifts and inheritances included in petitioner's income by respondent are taxable and are not to be excludable under section 102. Accordingly, a deduction should be allowed for the $ 557 expense to collect the taxable bequest. We find such $ 557 deductible based on respondent's concession that the expenses of even *421 a nonbusiness activity may be deducted to the extent of income procured. 12. Addition to Tax for Failure to File Tax Returns -- Section 6651(a)(1)
Section 6651(a)(1) provides for the imposition of an addition to tax not to exceed 25 percent of the underpayment for failure to file a timely return unless the taxpayer shows that such failure was due to reasonable cause and not due to willful neglect. As to reasonable cause, the regulations call on the taxpayer to show that he used "ordinary business care and prudence." Sec. 301.6651-1(c), Proced. & Admin. Regs. Willful neglect is defined to mean a conscious, intentional failure or reckless indifference. United States v. Boyle,469 U.S. 241 (1985). Respondent has determined that petitioner is liable for this addition to tax for the fiscal years 1980 through 1983. Petitioner argues, for several reasons which we shall discuss, that it had reasonable cause for failure to file corporate income tax returns for those years. We hold for respondent on this issue. Based on petitioner's representations that it was organized and operated exclusively for charitable purposes within the meaning of section 501(c)(3), the Commissioner issued the *422 July 7, 1960, exemption ruling. That ruling granted exemption "based upon the evidence presented" and stated that petitioner was "not required to file income tax returns unless you change the character of your organization, the purposes for which you were organized, or your method of operation." In this proceeding petitioner has admitted, in fact aggressively contended, that every one of its 19 activities (except Education/Rehabilitation which was conceded on brief) in which it engaged during the years in controversy was a business carried on for petitioner's profit. Petitioner has further stipulated that it does not contend that it was entitled to exemption during any one of the seven years before the Court. Clearly, therefore, petitioner had changed its purposes and methods of operation from those stated in its exemption request without informing the Internal Revenue Service. The exemption ruling, therefore, does not relieve petitioner of the duty imposed by section 6012(a)(2) on "Every corporation subject to taxation under subtitle A" to file an income tax return. See also sec. 6011(a). The existence of that ruling does not constitute reasonable cause for failure to file returns *423 for the years in controversy. Birmingham Business College, Inc. v. Commissioner,276 F.2d 476, 482 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Stevens Bros. Foundation, Inc. v. Commissioner,324 F.2d 633, 646 (8th Cir. 1963), affg. on this issue 39 T.C. 93 (1962). Petitioner argues that the Forms 990-T filed by petitioner should be accepted as its income tax returns because, the argument goes, those forms contain information on which a tax liability may be determined and assessed. Petitioner cites Germantown Trust Co. v. Commissioner,309 U.S. 304, 309 (1940), involving a trust ultimately held to be taxable as a corporation, and California Thoroughbred Breeders Association v. Commissioner,47 T.C. 335, 339 (1966), involving an agricultural or horticultural organization exempt from tax under section 501(c)(5) which filed a Form 990 information return but not a Form 990-T as an organization with unrelated business income. We disagree with petitioner's argument. The Forms 990-T filed by petitioner state that petitioner was exempt from income taxes, the taxes here in dispute, under section 501(c)(3). They reported only a small portion of the income from Adgap as unrelated *424 business income taxable under section 511. The forms contain no identifiable information on the other 13 stipulated business activities in which petitioner was engaged during parts of the period in controversy. The manifest difficulty of using the Form 990-T for the determination of tax liability is demonstrated by a comparison of the deficiencies totaling over $ 28,000,000, determined in the notice of deficiency, without the benefit of an examination of petitioner's books and records with the figures, approximately one-half of the determined amount, set forth in respondent's answer. As explained in Commissioner v. Lane-Wells Co.,321 U.S. 219, 223 (1944), the purpose of requiring income tax returns "is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the physical task of handling and verifying returns may be readily accomplished." See also Durovic v. Commissioner,487 F.2d 36, 40 (7th Cir. 1973), affg. on this issue 54 T.C. 1364 (1970); Parker v. Commissioner,365 F.2d 792, 800 (8th Cir. 1966), affg. on this issue a Memorandum Opinion of this Court. The Forms 990-T do not suffice as returns. The cases cited *425 by petitioner are distinguishable on their facts. Petitioner next argues that it did not file returns because, in light of advice from its tax counsel, it had a good-faith belief that it was exempt from taxation, citing Cleveland Chiropractic College v. Commissioner,T.C. Memo. 1962-1, affd. on other issues 312 F.2d 203 (8th Cir. 1963). The tax counsel on whom it relied, however, were not outside, unbiased, objective advisors. They were members of the Synanon insiders' group who knew Synanon was operating for-profit businesses and was not, therefore, entitled to exemption. In fact, two of them are attorneys, Synanon residents, who in the trial of this case took the position that every activity in which Synanon engaged during the seven years before the Court was carried on for profit. These attorneys and accountants were fully aware of the facts during the years before the Court and were fully aware that for-profit corporations are required to file corporate tax returns. Good faith does not permit such easy changes of positions. Good faith does not permit a blurring of the distinction between objective facts and legal positions based on falsehood. We do not think petitioner had *426 a good-faith belief that it was tax-exempt under section 501(c)(3) during the seven years before the Court. The Cleveland Chiropractic College case, cited by petitioner, involved alleged errors in the taxpayer's exemption ruling request which the Court found were not material misrepresentations. The case is obviously distinguishable on its facts. Finally, petitioner points out that in the notice of revocation petitioner was instructed to file corporate tax returns for its fiscal years 1977 and 1978 but was not so instructed for its fiscal years 1980 through 1983. Petitioner argues that the addition to tax cannot be applied because it merely followed the IRS instructions. This argument hardly comes with good grace. The revocation of petitioner's exempt status was based on an IRS audit covering only the years 1977 and 1978 and the revocation notice instructed petitioner to file income tax returns for those years. It said nothing about the ensuing years. During the seven years before the Court, as noted above, however, petitioner was engaged in a wide variety of for-profit business activities. Its management hierarchy, including its attorneys who advised it on tax matters, knew *427 this was true. The attorneys were fully aware that petitioner was not, therefore, entitled to tax exemption and, under the law, was required by statute to file tax returns regardless of what instructions the IRS had issued. The fact that petitioner had not been instructed to file returns for 1980 through 1983 in any manner other than the plain words of section 6012(a) does not relieve it of the obligation to do so. Petitioner has not shown that it had reasonable cause within the meaning of section 6651(a)(1) for its failure to file income tax returns for 1980 through 1983. The addition to tax is, therefore, applicable. 13. Additions to Tax for Negligence or Intentional Disregard -- Secs. 6653(a), 6653(a)(1) and (2)
For all the years before the Court, sections 6653(a) and 6653(a)(1) provide for the imposition of an addition to tax in the amount of 5 percent of the underpayment if any part of the underpayment is due to negligence or intentional disregard of the rules. For petitioner's fiscal years 1982 and 1983, section 6653(a)(2) imposes a further addition to tax in an amount equal to 50 percent of the interest on the portion of the underpayment due to negligence or intentional *428 disregard of the rules. Respondent determined that petitioner is liable for the sections 6653(a) and 6653(a)(1) additions to tax for all the years in controversy and for the section 6653(a)(2) addition to tax for 1981, 1982 and 1983. Petitioner makes, basically, the same arguments, discussed above, that it made with respect to the section 6651(a)(1) addition to tax. Negligence under section 6653(a) is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Farrell v. Commissioner,90 T.C. 1154, 1201 (1988); Neely v. Commissioner,85 T.C. 934, 947 (1985). The issue is factual. For the reasons discussed above (issue 12), we reject petitioner's arguments that it had a good-faith belief that it was exempt from tax and that it relied in good faith on the advice of its counsel and accountants. We do not think reasonable and ordinarily prudent corporate executives and legal staffs would have failed to report the corporation's income, knowing that the corporation was engaged in numerous activities which were for-profit trades or businesses. To fail to do so was negligence. We add that, in our view, petitioner intentionally *429 disregarded the regulations on reporting its tax liability for the years before the Court. In upholding the revocation of its exempt status, the district court held that Synanon, in an earlier proceeding in the Superior Court for the District of Columbia, had committed fraud on the court. See Synanon Foundation, Inc. v. Bernstein,503 A.2d 1254, 1262 (D.C. App. 1986). The District Court found that the fraud consisted of, among other things, Synanon's willfully and systematically destroying and altering an extensive number of "documents and tapes relevant to a determination of Synanon's tax-exempt status." Synanon Church v. United States,579 F. Supp. 967, 972 (D.D.C. 1984). The United States Court of Appeals for the District of Columbia affirmed the District Court's holding that Synanon was collaterally estopped to deny that its executives and legal staff willfully destroyed evidence relevant to its entitlement to tax-exempt status. Synanon Church v. United States,820 F. 2d 421, 428 (D.C. Cir. 1987). The clear inference from this willful destruction of documents bearing on its nonprofit or tax-exempt status, and the attempts to cover up the destruction, is that Synanon's executives *430 and attorneys knew Synanon was not a section 501(c)(3) exempt organization. They intentionally disregarded the regulations requiring the reporting of its income and the payment of a tax thereon. We conclude that petitioner is liable for the sections 6653(a) and 6653(a)(1) additions to tax for all the years in controversy. As to the portion of the underpayment attributable to negligence, we hold that the section 6653(a)(2) addition to tax applies to the entire underpayment for fiscal years 1982 and 1983 and that petitioner is liable for the addition to tax for those years. Although the parties have not raised the issue, we hold that petitioner is not liable for the section 6653(a)(2) addition to tax for its fiscal year 1981. Section 6653(a)(2) came into the law as section 722(b) of Public Law 97-34, 95 Stat. 342, the Economic Recovery Tax Act of 1981, and was made applicable to taxes the last date prescribed for the payment of which is after December 31, 1981. Section 6151(a) provides the general rule that a person required to make a return shall pay the tax at the time fixed for filing the return. Under section 6072(b), a corporation's return for a fiscal year is to be filed on *431 or before the 15th day of the third month following the close of the fiscal year. Thus, petitioner's return for its fiscal year ended August 31, 1981, was due to be filed, and the date prescribed for payment of the tax was November 15, 1981, which is before the effective date of section 6653(a)(2). Petitioner is not, therefore, liable for the section 6653(a)(2) addition to tax for its fiscal year 1981. 14. Addition to Tax for Failure to Pay Estimated Tax -- Sec. 6655(a)
Section 6655(a) provides for the imposition of an additional tax for failure to pay estimated income tax for the years 1980 through 1983. Petitioner paid no estimated tax and offered no evidence to explain its failure to do so. The addition to tax is mandatory. Newman v. Commissioner,T.C. Memo. 1984-416; Nielsen v. Commissioner,T.C. Memo. 1984-405. The addition to tax is, therefore, applicable. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and as in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. 2. Section 6653(a) is applicable to fiscal years ended August 31, 1977, through August 31, 1981, whereas sections 6653(a)(1) and 6653(a)(2) are applicable to fiscal years ended August 31, 1982, and August 31, 1983. See discussion of Issue 13, infra.↩
*. 50% of the interest due on the underpayment.↩
3. The Adgap catalog for 1977-1978 describes the Synanon Game as follows: The game is typically played by 8-16 people seated in a circle. Old and young confront one another, black and white, employer and employee. The Game is a powerful communications tool that is used in all aspects of the Synanon lifestyle: by top management, or by a kitchen crew at the start of their day; by husbands and wives and even by young children. It is basic to our success.↩
4. While the September 1, 1976, agreement was modified to increase Dederich's annual salary from $ 75,000 to $ 100,000 beginning for fiscal year 1978, there is a discrepancy between Dederich's yearly salaries and the salaries which Synanon controller Brooks Carder stated were paid to Dederich. In his affidavit dated May 9, 1983, which was offered by petitioner in its tax exemption declaratory judgment action, Carder stated Dederich received the following salaries: (1) $ 76,237 for fiscal year 1976; (2) $ 75,000 for fiscal year 1977; (3) $ 50,122.73 for fiscal year 1978; and (4) $ 100,000 for fiscal year 1979, (which, according to the affidavit, "was salary advanced and taxes withheld during fiscal year ending 8/31/78").↩
5. The following is an excerpt from a transcript of a tape recording of a December 11, 1975, executive committee meeting of Synanon's board: Dederich: Something like this (inaudible) occurs to me. We set up a private, a private company, a stock company, with x number of shares. Each month, we can transfer over to -- we could transfer over the assets of Synanon in some way, like for instance, supposes we determine what this place is worth in rental, starting, you know, like in a month or two -- this company could own a part of this place and, and in turn, charge rent for it. * * *
Synanon director and general counsel Dan Garrett: Okay, there's a general rule about transferring assets. * * *
But for instance, let's take the Home Place (property), which is worth x hundred thousand dollars, and we want to get that over in to Home Place Investors, Inc. Now in order to do that, there's going to have to be a fair exchange of consideration -- otherwise, we are in the business of giving away the assets of a nonprofit charitable foundation. Dederich: We'll give it away in salary. Garrett: Yeah. Yeah, what we can do is make a deal between Home Place Investors, Inc. and Synanon Foundation, Inc. for, Home Place Investors, Inc. to buy that property. Now on very favorable terms, over a long period of time. In the meantime, the people who are going to be participants, shareholders, bond holders or whatever -- will be paid the money and they'll be buying their shares of stock, which will be used to pay it back.
Dederich: Un huh.
Garrett: * * *
Now, now there's that situation. There is, now that would include for instance, a going business like ADGAP, which now has enormous goodwill, which has a real value on paper, and you know, if you want to sell, it'd bring a lot of money and so on.
Now we've got something brand new like, like the direct mail business. Now there is something that that, has a very tiny goodwill * * *
Garrett: But we could get that into Home Place Investors, Inc. right away. * * *
Garrett: Now we could look for situations where it comes out of our heads, and before it accumulates its assets and goodwill, and presents a problem, we could start putting it into this new corporation, and building up a way of buying all of Synanon -- and Synanon eventually * * * * * *
Dederich: Yeah, Yeah. See, if we ever start paying some salaries here, which we have every justification for doing; I mean, it makes real good sense. I can say, and if I say it, it's true -- it was my intention to put everything I had into Synanon for the first 15 or 20 years to get the God damn thing off the ground, like the immigrant who started every department store in every big city in America did. He worked his God damn ass off, you know, he lived in the slums some place, and then one day he looked up and he, he owned Bloomingdales. That's the way it was done -- that's exactly the way it was done.
Now, taking me as an example -- I can now afford to pay myself. I can afford to take enormous amounts of money out of this corporation in the form of salary. "What am I worth? Judge for yourself -- look what I did, you see?"
And then, if the company says, "Well, what is this 10 year member, or 15 year member?" He's worth what I say he's worth. You see, ten, fifteen, twenty, thirty thousand dollars a year. Just take it out and put it into this, into this investment situation. And the money piles up so God damn fast.↩
6. Dederich at an April 27, 1976, Synanon board meeting stated: "And now, the last thing, I want to make big daddy and his * * * wife totally independent for the rest of their natural lives." ↩
7. The following is an excerpt of a tape recording of an August 13, 1976, Synanon board meeting: [Synanon attorney] Howard Garfield: An easier way to do it is * * * deed of trust on one of our real properties. Garrett: Hey yeah, maybe that's it. Garfield: And that you would decide it was worth, like either this place which we own free and clear or the ranch which we own free and clear, which is practically immune from any kind of lien, including government lien, except for withholding tax. Garrett: There you go, that's very simple. Of course, of course. * * * Dederich: A deed of trust, and then what would happen? The Foundation would pay a mortgage? Garrett: The Foundation would pay it off, just like it pays off any other -- [Synanon Director] Ron Cook: Pay your contract. * * * Dederich: I understand, I understand then on default I would have a plaster on that property. Garrett: Then of course that plaster shows as a diminution of the net worth [of] that property [from Synanon's assets]. Dederich: Yeah.↩
8. The following are statements made during the December 11, 1975, executive committee meeting and the August 13, 1976, board meeting: December 11, 1975
Dederich: * * * You -- see, we've all gotten used to the idea of the highly placed people in Synanon all working for nothing. I haven't made a * * * lot more than my board since day one * * *. And we just take it for granted -- all the kiddies in the house take it for granted that, people are worth certainly across the board, than what they're worth in other companies and corporations -- all work for nothing. But we don't have to work for nothing any more because we have money to pay our bills. We've never taken -- the only bill we haven't paid in Synanon is our help. You know, now we pay the help up to about, within 15% of the top; we pay it in food, clothing, medical care, children, heat, light, education, and everything else. Because every carpenter in Synanon makes two or three times as much as a carpenter on the streets. * * * So we're talking about a rather small group of people, you see. * * * August 13, 1976
Dederich: I've been trying all along to get the properties of Synanon in the hands of, you know, to Synanon people. I don't mean the guttersnipe newcomers, you know, I mean the people who own and run Synanon. Garrett: Yeah. Dederich: And this is the step in that direction. Garrett: We take our money, pay off the thing, put first liens on there in favor of this group to secure payment of these contracts. * * * Garfield: And to say we make a contract with Chuck for the next 15 years at $ 100,000 a year, and that's a million five. * * * Garrett: Yeah. Dederich: Don't you think so? Garrett: Sure, I think so. Garfield: I don't have any problem with you, Chuck. As Dan said, if you divide the group into two parts, it's easier, far easier to do this with you than it is with anyone else.
*. -- Includes 17,300 of depreciation on either machinery and equipment or transportation. ↩
**. -- Includes 77,451 of depreciation on either machinery and equipment or transportation. ↩
***. -- Includes 43,579 of depreciation on either machinery and equipment or transportation. ↩
****. -- Includes 337,633 of depreciation on either machinery and equipment or transportation.↩
9. The "important decision" here referred to is Anaheim Union Water Co. v. Commissioner,321 F.2d 253 (9th Cir. 1963), revg. in part 35 T.C. 1072 (1961). In that case, the taxpayer had substantial investment income and used part of that income to furnish water to its members at less than cost. The Tax Court held that the taxpayer could not deduct expenses in excess of income from its water activity on the ground that such excessive expenses were not ordinary and necessary under section 162(a)↩. The Court of Appeals allowed the full amount of the expenses, concluding that they were ordinary and necessary expenses of the water activity regardless of the taxpayer's nonbusiness income.
10. The notice of deficiency disallowed the disputed deductions in general terms. The parties quibble at length about who has the burden of proof on this issue. The quibble is not important to our conclusion because we would reach the same decision regardless of who has the burden of proof.↩
11. Synanon published printed and illustrated catalogs in which it advertised Adgap products and solicited donations. The 1977-1978 catalog, for example, included the following among several descriptions of its activities: SYNANON RESOURCES Synanon Resources encompasses two major wings, Synanon Supply and Synanon Advertising Gifts and Premiums -- ADGAP. Supply seeks tax-deductible contributions of goods and services throughout the country, one of the largest operations of its kind in terms of scope. The American business community has donated almost every item and service under the sun in quantities from handfuls to boxcar loads: clothes, food, lumber, cattle, office supplies, and electronics gear among them. There are more than 20,000 donors on our records, including almost one out of every five corporations on the "Fortune 500" list. * * * Resources is our largest single source of support, providing more than 40% of our total cash flow. Another 40% is earned in other businesses, and the remaining 20% comes from contributions. All of the profits from Resources go directly into the Foundation's general fund and are used to support our work with drug addicts, delinquents and others in trouble.↩
12. In the 1978-1979 Adgap catalog is the following explanation of section 170(e): HOW CAN A COMPANY BENEFIT BY DONATING TO THE SYNANON DISTRIBUTION NETWORK? In 1976, Congress authorized the Internal Revenue Service to revise Section 170(e)(3) of the Internal Revenue Code. The revision increased the deductions that a corporation may claim for contributing inventory and business property to a tax-exempt organization. Our legal counsel has determined that contributions to Synanon, a Section 501(c)(3) organization, qualify for this increased deduction. Companies may now deduct their cost plus 50% of the gross profit of the donated goods. In the past, companies could only deduct their cost. Under the new regulations, if a product costs $ 100, and the sale price is $ 200, a company can claim a $ 150 charitable deduction. This deduction is limited to twice the cost. In some cases, it is actually more profitable to donate inventory as opposed to selling it because of the income-tax savings. To comply with the law and to protect the donor, we make sure goods are not sold or traded and that they are distributed only to the ill, the needy, or infants. A similar statement is included in the 1980-1981 Adgap catalog.↩
13. Bequests, like gifts, may be taxable income. The courts have repeatedly held, for example, that bequests may constitute compensation for services. Green v. Commissioner,846 F.2d 870 (2d Cir. 1988); Wolder v. Commissioner,493 F.2d 608 (2d Cir 1974), affg. 58 T.C. 974 (1972); Braddock v. United States,434 F.2d 631 (9th Cir. 1970); Cotnam v. Commissioner,263 F.2d 119 (5th Cir. 1959), affg. in part, revg. in part 28 T.C. 947↩ (1957).
14. See Synanon Foundation, Inc. v. Bernstein,503 A.2d 1254 (D.C. App. 1986); The Synanon Church v. United States,579 F. Supp. 967 (D. D.C. 1984), affd. 820 F.2d 421↩ (D.C. Cir. 1987).
15. On brief, petitioner states that an additional $ 5,000 of otherwise deductible settlement fees paid in a property case was inadvertently omitted from the parties' stipulation and from petitioner's own trial exhibit listing the matters in which fees were incurred. Petitioner, while calling this omission on its part to our attention, concedes, as a result, that it may not receive a deduction for such $ 5,000 of additional expense.↩
16. Kohl and Lukjanczyk (described summarily p. 52, supra↩). 17. Ross, Tolchin and Confidential Settlement (FYE 1982) (described summarily p. 53, supra↩). 18. Apar Guardianship, Crawford and Guardianship/Children Legal Fees (described summarily pp. 51, 52, supra↩). 19. Arizona, Benjamin, People v. Dederich and Superior Court/Tulare (described summarily pp. 51, 53, supra↩). 20. CED Defense Fund, Eidson, Gambonini, Marino and Smith, Morantz, Morantz/State of California, Morantz Publication, Mulrooney, Confidential Settlement (excluding FYE 1982) and Expense Reimbursement Law Department (described summarily pp. 52, 53, supra↩). 21. CIR I, IRS and Excise Tax (described summarily pp. 51, 52, supra↩). 22. Office expenses; Home Place petty cash; Kerhonkson petty cash; Los Angeles petty cash; petty cash; San Francisco petty cash; Strip petty cash; Tomales Bay petty cash; publications; travel, food and lodging, Law Department; reclassification; Synanon attorney expenses and McCready Estate.↩
23. Of the $ 4,312,092 of total disputed professional fees, $ 3,101,502 relates to matters in this category and the following category for civil cases involving acts by residents allegedly done in the course and scope of their employment with petitioner. While petitioner has discussed these matters as simply involving alleged acts done in the course of residents' employment with Synanon, we think the criminal cases are more appropriately placed in a separate category. Petitioner was not named as a defendant in the criminal cases brought in state court. In contrast, in the civil cases petitioner was named as a defendant under the theory of respondeat superior.
24. Section 212(3) expressly allows individuals to deduct all ordinary and necessary expenses paid or incurred "in connection with the determination, collection, or refund of any tax." When section 212 was adopted, it was not extended to corporations "on the theory that sec. 162(a) covers the same ground for corporations that section 162(a) and 212 in combination cover for other taxpayers." Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, sec. 5.03, pp. 5-8 to 5-9 (1979). In Bingham's Trust v. Commissioner,325 U.S. 365 (1945), the Supreme Court observed that section 162 and section 212 are comparable and in pari materia. The Court therefore allowed the deduction under section 212↩ of a trust's tax litigation expenses because they were expenses incurred for the conservation of income-producing property.